2021 IL App (1st) 180191-U

THIRD DIVISION
February 10, 2021

No. 1-18-0191

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 02 CR 13497 |
| | ) | |
| CHRISTOPHER CARTER, | ) | Honorable |
| | ) | Steven G. Watkins, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justice Ellis concurred in the judgment.
Justice Burke specially concurred.

ORDER

¶ 1  *Held*:  The judgment of the circuit court of Cook County summarily dismissing defendant's postconviction petition is reversed; defendant's postconviction petition, which alleged his *de facto* life sentence violated the eighth amendment of the United States Constitution and the Proportionate Penalties Clause of the Illinois Constitution, was not based on an indisputably meritless legal theory or fanciful factual allegations; the cause is remanded for second stage postconviction proceedings with instructions to conduct a hearing to permit defendant to attempt to demonstrate the applicability of *Miller v. Alabama*.

¶ 2  Defendant appeals from the trial court's first stage summary dismissal of his *pro se*

postconviction petition filed pursuant to section 5/122-1 of the Post-Conviction Hearing Act (725

ILCS 5/122-1 (West 2016)). In his petition, defendant, who was 20-years old at the time of his offense, argued his 100-year sentence for first degree murder, aggravated kidnapping, armed robbery, and residential burglary was a *de facto* life sentence which violated the eighth amendment of the United States Constitution and the Proportionate Penalties Clause of the Illinois Constitution where the trial court failed to consider defendant's youth and its attendant characteristics in arriving at his sentence. For the reasons set forth below, we reverse the trial court's judgment and remand for further proceedings under the Post-Conviction Hearing Act.

¶ 3                                    BACKGROUND

¶ 4       Defendant, Christopher Carter, appeals the trial court's judgment summarily dismissing his initial petition for postconviction relief. Following a jury trial, defendant was found guilty of first degree murder, aggravated kidnapping, armed robbery, and residential burglary. The jury also found the victim James Vanston's death resulted from exceptionally brutal and heinous circumstances indicative of wanton cruelty allowing the trial court to impose discretionary extended term sentencing. Defendant was sentenced to 100 years' imprisonment—80 years for murder; 20 years for aggravated kidnapping; 20 years for armed robbery; and 10 years for residential burglary—and ordered the latter three incarceration periods to run concurrently to each other and consecutive to the murder sentence. On direct appeal this court affirmed defendant's conviction and sentence in *People v. Carter*, No. 1-06-2510 (2008) (unpublished order under Illinois Supreme Court Rule 23). Leave to appeal was denied. *People v. Carter*, 229 Ill. 2d 674 (2008).

¶ 5                                 Defendant's Trial

¶ 6       Defendant, who was 20-years old at the time of the offense, was charged with first degree murder for Vanston's death along with co-defendants Greg Crowder and Marcus Smith, who were

respectively ages 26 and 23 at the time of the offense.  Defendant and co-defendant Smith had simultaneous but severed jury trials after which Smith was found guilty and sentenced to 100 years' imprisonment.  Crowder pled guilty in exchange for a sentence of 72 years' imprisonment.

¶ 7     We recount the relevant evidence and details from defendant's trial as previously set forth by this court on direct appeal.

"On March 28, 2001, defendant had known Crowder for about four months.  Defendant often drove Crowder around because Crowder did not own a car.  Defendant asked Crowder if he could borrow some money, and Crowder said yes.  Defendant picked up Crowder, and the men went to Smith's apartment.  Crowder displayed a gun and told defendant and Smith he planned to use the weapon against Vanston because Vanston owed him money.  (Defendant testified at trial, however, that Crowder gave him a pager when they arrived at Smith's apartment and told defendant to return when he was paged.)

In his inculpatory statement, defendant said that when Crowder announced his plan to attack Vanston, Smith produced gloves, a telephone cord and a crowbar.  Smith demonstrated a tactic on defendant that Smith said he planned to use to 'bring the man down,' after which defendant should tie up Vanston.  When Vanston arrived at Smith's apartment, Smith forced Vanston to the ground and defendant tied Vanston's hands and feet with the phone cord.  The men carried Vanston to the garage, where Crowder and Smith looked for Vanston's wallet.  Crowder and Smith left defendant alone with Vanston for between 30 and 60 seconds.  At trial, defendant testified that while they were in the garage, he said he

wanted to leave but Crowder replied: 'Nobody is going anywhere until everything is over with.'

After Crowder returned and demanded money from Vanston, and Vanston refused, Crowder accused Vanston of lying. Crowder and Smith hit Vanston with the crowbar. Crowder and Smith left defendant alone with Vanston again and returned with gasoline. Smith poured the gasoline on Vanston, and defendant supplied a match at Smith's request. Smith lit the match and threw it at Vanston; however, the flame set some paper on fire, and Smith and defendant extinguished the flames.

Defendant and Smith put Vanston into the trunk of Vanston's car. The three men drove around searching for a place to leave Vanston. Smith suggested leaving Vanston in the catch basin attached to the sewer behind Smith's apartment building. The men drove back to Smith's apartment building. Smith told defendant to stab Vanston with a knife, but defendant refused. Crowder stabbed Vanston twice, and Crowder and Smith pushed Vanston into the catch basin. All three men covered Vanston with dirt and then changed their clothes and cleaned up the area. Vanston was still alive at that point but later died of his injuries.

After disposing of Vanston, defendant drove Crowder and Smith to Vanston's residence and waited in the car while Crowder and Smith went inside and retrieved four bags of items and a television. After Crowder and Smith took those items to their houses with defendant's assistance, Crowder told defendant he had not 'forgotten' about him. The next morning, defendant picked up Crowder

and they drove to a Gap store, where Crowder purchased clothing using Vanston's credit card. Defendant picked up Smith, and the three men used the credit card to buy gas.

At trial, defendant testified that he participated in Vanston's murder because he was afraid of Crowder and Smith. ***

The jury found defendant guilty of first degree murder, aggravated kidnaping, armed robbery and residential burglary and found that Vanston's death resulted from exceptionally brutal and heinous circumstances indicative of wanton cruelty." See *Carter*, No. 1-06-2510 (2008) (unpublished order under Illinois Supreme Court Rule 23).

¶ 8                                    Defendant's Sentencing Hearing

¶ 9     Defendant's motion for new trial was denied after which his sentencing hearing commenced.

¶ 10     Defendant submitted for consideration a sentencing memo which outlined his age, lack of criminal history prior to the offense, education, employment, living situation, character, and psychological characteristics. The memo discussed defendant's participation in the offense, his cooperation with the police, and behavior during his five years of incarceration. The memo outlined various statutes relevant to defendant's sentencing and highlighted mitigating factors with citation to case law in the following areas: young age, lack of criminal history, comparatively limited role in the offense, good family background and relationships, expression of remorse, and positive adjustment to incarceration. The memo concluded with a discussion of the cost of defendant's incarceration. Affidavits of his father, four neighbors, and two Cook County Jail corrections officers were attached to the memo along with the report of I. Bruce

Frumkin, Ph.D. which analyzed defendant's results from his Minnesota Multiphasic Personality Inventory-2 (MMPI-2) and 16 Personality Factor (16 PF) psychological tests.

¶ 11    A Pre-Sentence Investigation Report (PSI) was also submitted outlining defendant's date of birth, lack of criminal history, discussion of the offense, defendant's social history, familial relationships, education, employment, physical and psychological health, drug use, involvement in the community, and economic status.  At sentencing, the trial court acknowledged having reviewed these documents.

¶ 12    Argument from the State and defendant's counsel was heard, and the State tendered the victim impact statement from the victim's sister, the contents of which were stipulated to by the parties.  Defendant offered a statement in allocution.

¶ 13    Prior to imposing defendant's sentence, the trial court noted the jury found defendant's behavior "exceptionally brutal and heinous and indicative of wanton cruelty" which allowed the trial court to impose discretionary extended term sentencing on the murder conviction of 60 to 100 years.  The court indicated it agreed with the jury defendant's actions "were brutal and indicative of wanton cruelty."

¶ 14    The trial court addressed defendant's sentencing memorandum and commented on the dual considerations in sentencing—the seriousness of the offense and the rehabilitation of the offender—both of which, the court explained, were to be given weight.

¶ 15    The trial court commented on defendant's argument he was lured to the premises under false pretenses and had a comparatively limited role in the offense, stating:

> "This is not false pretenses.  This defendant knew exactly from the get-go what was going to happen here[.]  ***

Further, the testimony here that he did not know what was going on. He stood in a garage where two human beings poured gasoline on a victim who was hog-tied, and they asked him, [defendant], standing [there] of his own free will, do you have a match, a light; he had said no, but I've got a match, here. Is that anything in regard to compulsion?

He knew at that time what was going on. To say to this Court now, today, after the trial that he was here under false pretenses is absurd. He knew exactly what he was getting into. He went there for a purpose, and that purpose was clear based on his testimony and based on his videotaped statement. To get up now and say that he was not liable or accountable, or a lesser degree of accountability, how is that true?

To say in your memorandum that after a few weeks later he decided to help the police? After they found him after four weeks, after they located him, then he decided to help the police. And now this Court is supposed to take that into consideration to lessen a sentence. That is absurd.

The comparative limited role of this offender, he was in it all the way. He knew what was going on, he stayed there, he helped put this man in a trunk and drive him around, he helped place him in the sewer, and then he went to the house to steal whatever was there. Compulsion, the jury didn't buy it and this Court doesn't buy it[.]"

¶ 16    The trial court commented on defendant's character stating:

"To argue today that this defendant is passive, dependent, timid, submissive; well, there was testimony in this case where this defendant told

- 7 -

Gregory Crowder what to do. After they put that man in the sewer, he handed Crowder his car keys and said go wait in the car. They and Miracle then drove the car around.

He, this defendant was just as active, just as liable and just as in control as those other individuals. The toxic influence of Crowder on [defendant] is absurd. What happened to free choice and free will, what happened to individual culpability, what happened for this man at any time to say I'm done, I'm out of here?

When he hid behind that truck he knew he was going to tie up another human being for the purposes of collecting a debt, and to tell this Court today after trial that he did not know what was going on is absurd. It insults this Court's intelligence.

I ask rhetorically what was [defendant] thinking while he saw somebody throw gasoline on an individual and then turn to him and say do you have a light. Do you know what his answer was on cross examination: I knew he was either going to burn the victim or the garage. And he still gave him the match.

To tell me he didn't know what he was doing, and that's even before this alleged compulsion came in, to tell this Court today that he didn't know what he was doing, that he was a dupe, that he was there under false pretenses, my God, what does it take a human being to say I'm out of here, chase me as far as you want, I'm out of here; beat me up, but I'm not going to set another human being on fire. Absurd."

¶ 17    The trial court commented on defendant's good family and neighbors and discussed the factors in aggravation and mitigation pursuant to Illinois statute. The court also commented again on the seriousness of defendant's crime stating it is "beyond brutal and heinous" and further commenting it "cries out for punishment, and not the minimum term." The court refused to accept defendant was "the gullible person five years ago."

¶ 18    After stating it considered all the factors in aggravation and mitigation, the trial court sentenced defendant to 80 years for first degree murder, 20 years each for aggravated kidnapping and armed robbery, and 10 years for residential burglary, and ordered the latter three incarceration periods to run concurrently to each other and consecutive to the murder sentence for a total of 100 years' incarceration.

¶ 19    Following sentencing, defendant filed a motion to reduce his sentence arguing it was excessive because:

> "(a) This sentence fails to take adequate account of the many significant mitigating factors brought to the Court's attention prior to the imposition of sentence, both in writing and orally, which included (i) the defendant's young age, (ii) his lack of any criminal history, (iii) his comparatively limited role in the offense, (iv) his good family background and relationships, (v) his expressions of remorse, and (vi) his positive adjustment to incarceration.
>
> (b) This sentence fails to distinguish properly between Carter and co-defendants Gregory Crowder and Miracle Smith for sentencing purposes. Crowder was sentenced to a term of 72 years' imprisonment following a guilty plea; Miracle Smith was sentenced to a term of 100 years' imprisonment following a joint trial (before a different jury) with Carter. As detailed both in

writing and orally prior to the imposition of sentence, a sentence far less severe than either of those would be appropriate for Carter, given (i) his significantly lesser culpability for this offense, and (ii) his significantly better prospects for rehabilitation.

(c) This sentence fails to take adequate account of Carter's extremely favorable prospects for rehabilitation (as evidenced by, among many other things, his positive adjustment to incarceration)."

¶ 20   Defendant's motion was denied. On direct appeal, defendant argued he was denied a fair trial due to contradictory and incorrect instructions to the jury. This court affirmed defendant's conviction and sentence. See *Carter*, No. 1-06-2510 (unpublished order under Illinois Supreme Court Rule 23).

¶ 21                                    Postconviction Petition

¶ 22   On November 15, 2017, defendant filed a *pro se* postconviction petition pursuant to section 5/122-1 of the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 (West 2016)).

¶ 23   In his petition, defendant argued only that his 100-year sentence violated the eighth amendment of the United States Constitution and the Proportionate Penalties Clause of the Illinois Constitution because it was a *de facto* life sentence and the trial court failed to consider defendant's youth and its attendant characteristics in arriving at his sentence.

¶ 24   The trial court subsequently entered a judgment summarily dismissing defendant's postconviction petition finding defendant's claims were "frivolous and patently without merit."

¶ 25   This appeal followed.

¶ 26                                         ANALYSIS

¶ 27　　On appeal, defendant argues the trial court erred in summarily dismissing his postconviction petition.  Defendant argues the sentencing court did not consider his youth as a mitigating factor or even reference it when it imposed the sentence, and the court explicitly rejected the results from the personality tests that showed that defendant was passive, dependent on others, timid, and submissive.

¶ 28　　Defendant acknowledges he was not a juvenile at the time of his offense but argues his 100-year sentence is a *de facto* life sentence and that the protections afforded juveniles in sentencing under *Miller v. Alabama*, 567 U.S. 460 (2012), should be extended to him. Specifically, defendant argues the sentencing court was required to consider the transient qualities of youth and their enhanced amenability to rehabilitation under the eighth amendment and the rehabilitation clause of Article I, Section 11 of the Illinois Constitution.  Both of defendant's constitutional challenges are as-applied challenges.

¶ 29　　Defendant's petition was summarily dismissed at the first stage of postconviction proceedings.  Our review of the trial court's judgment is *de novo*.  *People v. Patterson*, 2018 IL App (1st) 160610, ¶ 14.

¶ 30　　　　　　　　　　　　Post-Conviction Hearing Act

¶ 31　　The Act provides a mechanism for collateral attack of a conviction or sentence allowing for inquiry into constitutional claims relating thereto which were not, and could not be, adjudicated during the trial or determined on appeal.  725 ILCS 5/122-1 *et seq.* (West 2016); see also *People v. House*, 2019 IL App (1st) 110580-B, ¶ 25.  There is a three-stage process for hearing such constitutional claims.  *Patterson*, 2018 IL App (1st) 160610, ¶ 15.

　　　　　　　　"At the first stage, the circuit court independently reviews the petition and

　　　　　　　　determines whether the petition is frivolous or patently without merit.  [Citations.]

- 11 -

A petition may be summarily dismissed at the first stage as frivolous and patently without merit 'only if the petition has no arguable basis either in law or in fact.' [Citation.] A petition lacks an arguable basis in law or fact if it is based on 'an indisputably meritless legal theory or a fanciful factual allegation.' [Citation.] Because most petitions at the first stage are drafted by defendants with little legal knowledge or training, a defendant need only present a limited amount of detail in the petition to survive summary dismissal by the circuit court. [Citation.] That is, defendants only need to set forth the 'gist' of an arguably constitutional claim to meet the relatively low factual threshold to satisfy the first stage under the Act. [Citation.]" *Id.* at ¶ 15.

¶ 32 In first stage postconviction proceedings the defendant is not required to make "a substantial showing of a constitutional violation" nor is the defendant required to "demonstrate" or "prove" the alleged constitutional violation to avoid dismissal. *People v. Tate*, 2012 IL 112214, ¶ 19. The allegations in the petition are to be taken as true and liberally construed. *People v. Brown*, 236 Ill. 2d 175, 184 (2010); *People v. Plummer*, 344 Ill. App. 3d 1016, 1020 (2003).

¶ 33        Eighth Amendment Constitutional Challenges Applied to Juveniles

¶ 34 The eighth amendment prohibits "cruel and unusual punishments" and is applicable to the states through the fourteenth amendment. U.S. Const. amend. VIII; *People v. Davis*, 2014 IL 115595, ¶ 18.

"The eighth amendment's ban on excessive sanctions flows from the basic principle that criminal punishment should be graduated and proportioned to both the offender and the offense. [Citations.] To determine whether a punishment is

so disproportionate as to be 'cruel and unusual,' a court must look beyond history to 'the evolving standards of decency that mark the progress of a maturing society.' " *Id.*

¶ 35    Following a line of United States Supreme Court decisions applying the eighth amendment's ban on "cruel and unusual punishments" to juvenile sentences, the Court in *Miller*, 567 U.S. 460, held the imposition of a mandatory sentence of life without the possibility of parole for a juvenile offender who commits murder without consideration of the defendant's youth and its attendant characteristics violates principles of proportionality and thus the eighth amendment's ban on cruel and unusual punishment. *Id*. at 479-80, 489. It was subsequently decided *Miller* applied retroactively to cases on collateral review. See *Montgomery v. Louisiana*, 136 S. Ct. 718, 736 (2016); see also *Davis*, 2014 IL 115595, ¶ 34.

¶ 36    Accordingly, *Miller* and *Montgomery* require the trial to consider the juvenile's "youth and its attendant characteristics" *and* find the conduct "showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation" before the offender may be sentenced to life imprisonment without parole. *People v. Holman*, 2017 IL 120655, ¶ 46; *People v. Paige*, 2020 IL App (1st) 161563, ¶ 39 ("Although the trial court in this case 'weighed his rehabilitative potential as talked about here today,' it did not consider whether defendant was beyond rehabilitation so that he is one of 'the rarest of juvenile offenders *** whose crimes reflect permanent incorrigibility.' [Citations.]"). In conducting this analysis, the Court in *Miller* outlined a nonexclusive list of characteristics to be considered by the sentencing court. *Id.* These characteristics were later memorialized in *Holman* in a set of factors, referred to as the "*Miller* factors," and are as follows:

- 13 -

"(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.*, citing *Miller*, 567 U.S. at 477-78.

¶ 37          *Miller* Protections Extended to Discretionary and *De Facto* Life Sentences

¶ 38     In *People v. Reyes*, 2016 IL 119271, our supreme court extended *Miller* protections, finding that sentencing a juvenile offender to a *de facto* life sentence constitutes cruel and unusual punishment in violation of the eighth amendment. *Reyes*, 2016 IL 119271, ¶ 9. In *Holman*, our supreme court again extended *Miller* protections to include not just juvenile mandatory *de facto* life sentences, but also juvenile discretionary *de facto* life sentences. *Holman*, 2017 IL 120655, ¶ 40. Thereafter, our supreme court in *People v. Buffer*, 2019 IL 122327, determined what constitutes a *de facto* life sentence for a juvenile and drew the line at 40 years concluding such "a prison term is long enough to be considered *de facto* life without parole" for juvenile offenders. *Id.* at ¶ 40.

¶ 39                    *Miller* Protections Sought by Young Adults

¶ 40     In *People v. Thompson*, 2015 IL 118151, and *People v. Harris*, 2018 IL 121932, our supreme opened the door to the availability of *Miller* protections to young adult offenders bringing an "as applied" challenge to their life sentence, ruling that such cases required an evidentiary hearing to determine whether *Miller* applies in a given case. In *Thompson*, our

supreme court was asked to determine whether the "defendant's as-applied [eighth amendment] constitutional challenge to his sentence is procedurally barred or forfeited because the defendant failed to include [the as-applied challenge to his mandatory natural life sentence under *Miller*] in his 2-1401 [(735 ILCS 5/2-1401 (West 2010))] petition." *Thompson*, 2015 IL 118151, ¶ 25. On appeal of the dismissal of his 2-1401 petition, the defendant, who was 19 at the time of his offense, requested for the first time, the rationale of *Miller* be extended beyond minors under the age of 18 to find his sentence unconstitutional. *Id*. ¶ 17.

¶ 41    The appellate court affirmed the trial court's dismissal of the defendant's petition, declining to address the substance of his *Miller* claim, finding the as-applied challenge procedurally barred. *Id*. ¶ 18. The *Thompson* court affirmed the appellate court's decision on the basis that the defendant's as-applied constitutional challenge to his sentence was forfeited as it "is not a claim recognized by any of our precedents as exempt from the typical procedural bars of section 2-1401." *Id*. ¶ 35. While concluding the "defendant cannot raise his as-applied constitutional challenge to his sentence under *Miller* for the first time on appeal from dismissal of his section 2-1401 petition," the court stated, without expressing opinion on the merits of any future claim, the defendant "is not necessarily foreclosed from renewing his as-applied challenged in the circuit court" in a subsequent proceeding under "the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2012)) *** expressly designed to resolve constitutional issues, including those raised in a successive petition." *Id*. ¶ 44.

¶ 42    In *Harris*, our supreme court further opened the door for the extension of *Miller* protections to young adults under both the eighth amendment to the United States Constitution, (U.S. Const., amend. VIII) and article I, section 11 of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) "commonly referred to as the proportionate penalties clause." *Harris*, 2018 IL

121932, ¶¶ 34-61.  The defendant in *Harris* was convicted of first-degree murder, attempt first-degree murder, and aggravated battery with a firearm and was sentenced to a mandatory minimum aggregate term of 76 years' imprisonment.  *Id*. at ¶ 1.  The defendant was 18 years, 3 months of age at the time of his offenses.  *Id.*  The defendant appealed his sentence raising an as applied challenge under the Proportionate Penalties Clause and a facial eighth amendment challenge.  *Id.* at ¶¶ 37, 53.  In analyzing both constitutional claims the court noted the "critical" distinction between facial and as applied challenges stating:

> "A party raising a facial challenge must establish that the statute is unconstitutional under any possible facts, while an as-applied challenge requires a showing that the statute is unconstitutional as it applies to the specific facts and circumstances of the challenging party.  [Citations.]
>
> All as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge. Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review.  [Citations.]  We have reiterated that:
>
> > A court is not capable of making an as-applied determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact.  [Citation.]  Without an evidentiary record, any finding that a statute is unconstitutional as-applied is premature.  [Citations.]"
> >
> > (Internal quotations marks omitted.)  *Id.* at ¶¶ 38-39, 52-53.

¶ 43    With respect to the defendant's as-applied challenge under the Proportionate Penalties Clause, the *Harris* court explained because the defendant's as applied claim was not raised in the

trial court and he was a young adult such that *"Miller* does not apply directly to his circumstances[,]" the record needed to "be developed sufficiently to address defendant's claim that *Miller* applied to his particular circumstances." *Id.* at ¶¶ 45-48. The *Harris* court declined to remand the matter for an evidentiary hearing and, as in *Thompson*, stated the defendant's claim could more appropriately be brought in another proceeding under the Act which specifically allows for raising constitutional questions dependent on facts not found in the record. *Id.* at ¶ 48.

¶ 44     The court concluded the defendant's eighth amendment facial challenge, arguing the protections for juveniles recognized in *Miller* should be extended to all young adults under the age of 21, also failed. *Id.* at ¶¶ 53-61. Here, the court stated:

> "[F]or sentencing purposes, the age of 18 marks the present line between juveniles and adults. As an 18-year-old, defendant falls on the adult side of that line. Accordingly, defendant's facial challenge to his aggregate sentence under the eighth amendment necessarily fails." *Id.* at ¶ 61.

¶ 45     While unequivocally closing the door on eighth amendment *facial* challenges to young adults based on *Miller*, *Harris* does not foreclose an *as-applied Miller* challenge by a young adult offender.

¶ 46     As was set forth by this court in *People v. Ruiz*, 2019 IL App (1st) 163145, our supreme court's precedents set out the following procedure for young adults raising a claim that *Miller* protections apply to them:

> "(i) under *Harris*, a young adult defendant must plead, and ultimately prove, that his or her individual characteristics require the application of *Miller*;

(ii) if, and only if, the young adult makes this showing, then the trial court goes on to consider whether the initial sentencing hearing complied with *Miller*, ***; and

(iii) if the initial sentencing hearing was *Miller*-compliant, then the trial court can reject the defendant's claim ***; or if the initial sentencing hearing was not *Miller*-compliant, then the trial court should order resentencing." *Id.* at ¶ 52.

¶ 47                    Defendant's As-Applied Constitutional Challenges

¶ 48    As instructed by *Harris* and *Thompson*, defendant has raised his as applied constitutional challenges to his sentence under the eighth amendment and Proportionate Penalties Clause in a postconviction proceeding under the Act. Defendant argues his 100-year sentence is a *de facto* life sentence which "[a]s applied to [defendant] is invalid and violates [his] Eighth Amendment rights and the proportionate penalties clause of the Illinois Constitution." In support of his argument defendant cites various United States Supreme Court cases, including *Miller*, finding juvenile life sentences without consideration of the defendant's youth to be violative of the eighth amendment based on scientific research on adolescent brain development which has established juveniles lack maturity, are more vulnerable to bad influences, and are more amenable to rehabilitation. He further notes cases recognizing that, while courts have drawn a line between juveniles and adults at 18, that line is arbitrary and the qualities distinguishing juveniles from adults do not automatically disappear when the individual turns 18.

¶ 49    Defendant cites *House* and its application of the rationale in *Miller* to find the defendant's life sentence in that case unconstitutional where the defendant was 19 at the time of his offense and the sentencing court did not consider the *Miller* factors. Defendant also highlights portions

of the *House* findings which focused on research establishing that the brain does not finish development until mid-20s making young adults similar to adolescents with respect to their susceptibility to peer pressure, less future-oriented, and more volatile in emotionally charged settings.

¶ 50     The State argues "Defendant's as-applied proportionate penalties challenge fails as a matter of law because adult defendants, such as himself, cannot claim *Miller*-based protection to challenge their *discretionary* sentences."  (Emphasis in original.)  The State contends this is because *Harris* and *Thompson* involved mandatory life sentences and "the rationale underlying the holdings in both cases is exclusively driven by the fact that a mandatory statutory scheme that requires imposition of a life or *de facto* life sentence prevents sentencing courts from considering the individual circumstances of youthful offenders."  We disagree with the State.

¶ 51     In *Holman* our supreme court held *Miller* applies to discretionary sentences of life without parole for juvenile defendants.  *Holman*, 2017 IL 120655, ¶¶ 34-40.  This court sees no reason to depart from *Holman*'s rationale when dealing with a young adult raising a constitutional claim similarly rooted in the reasoning espoused in *Miller* against a discretionary *de facto* life sentence.  Additionally, defendant's 100-year sentence is well beyond the 40-year floor established in *Buffer* for juvenile *de facto* life sentences.  See *Buffer*, 2019 IL 122327, ¶¶ 40-41.  We point to Justice Burke's special concurrence in *Buffer* explaining a *de facto* life sentence can be calculated by determining when "the defendant's age at the earliest projected time of release exceeds an incarcerated minor's average life expectancy" such that a maximum sentence imposed on juveniles would allow release at age 55 based on the average life expectancy of incarcerated individual's statistics.  *Id.* at ¶¶ 65-67.  This suggested *de facto* life sentence calculation gives credence to defendant's as-applied challenge where his 100-year

sentence began in his early twenties. At minimum, we cannot say defendant's legal theory has no arguable basis in law.

¶ 52    The State also argues that even if we conclude there is merit to defendant's argument *Miller* and its progeny could apply to him, as we have here, defendant's postconviction claim nevertheless fails because the record "affirmatively establishes that the sentencing court considered defendant's age and individual circumstances before imposing the aggregate 100-year sentence" and thus, "defendant was already afforded the relief he seeks (*i.e.*, the application of *Miller* protections to a 20-years-and-9months-old defendant subject to discretionary sentence)[.]"). Accordingly, the State contends defendant's petition has no arguable basis in fact and was properly dismissed. We disagree with this contention.

¶ 53    With respect to this argument, the State argues *Holman* requires this court to look at the cold record in this case to determine whether the *Miller* factors were considered. The State goes on to conclude "the record shows that the court considered the *Miller* factors that the Illinois Supreme Court articulated in *Holman*, and therefore defendant received the benefit of those protections."

¶ 54    We acknowledge our supreme court in *Holman,* 2017 IL 120655, and more recently in *People v. Lusby*, 2020 IL 124046, considered the question of whether the defendants in those cases—both juveniles when their crimes were committed—received constitutionally adequate life sentences where their sentencing hearings were held before *Miller* was decided. Both cases involved appeals from the denial of a motion for leave to file a successive postconviction petition. *Holman*, 2017 IL 120655, ¶ 1; *Lusby*, 2020 IL 124046, ¶ 1. In *Lusby* the State argued the defendant's sentencing hearing complied with *Miller* and, as such, the defendant could not show prejudice. *Id*. ¶ 30. The *Lusby* court went on to outline portions of the record considered

by the sentencing judge relevant to each *Miller* factor concluding the defendant's youth and attendant characteristics were considered before Lusby's life sentence was issued and, as such, no prejudice was suffered due to the denial of Lusby's motion for leave to file a successive postconviction petition. *Id.* at ¶¶ 36-52. In *Holman*, the court, having concluded *Miller* applicable to the discretionary life sentence received by Holman, the court went on to identify and assess whether the five *Miller* factors had properly been considered by the sentencing judge in issuing Holman's life sentence. *Id.* at ¶¶ 40, 46-50.

¶ 55    We find *Holman* and *Lusby* distinguishable. First, *Holman* and *Lusby* dealt with successive postconviction petitions where the burden was to show both cause and prejudice, unlike defendant here who, at first stage proceedings, need only make a gist of an arguably constitutional claim. See *Patterson*, 2018 IL App (1st) 160610, ¶ 15. As noted above, at this stage, defendant is not required to make "a substantial showing of a constitutional violation" or "prove" the alleged constitutional violation. *Tate*, 2012 IL 112214, ¶ 19. Additionally, this court may not engage in any factual determinations. *Plummer*, 344 Ill. App. 3d at 1020.

¶ 56    Second, and even more significant, the defendants in *Holman* and *Lusby* were juveniles at the time of their offenses unlike defendant here. As pointed out by this court in *Ruiz*, because the defendant in *Holman* was a juvenile *Miller* presumptively applied whereas an adult seeking *Miller* protections—as defendant does here—"must make a preliminary showing before the court undertakes a *Holman* analysis—that is, establish *Miller* applies to [the defendant] in the first place." *Ruiz*, 2020 IL App (1st) 163145, ¶ 47. The *Ruiz* court explained that while the *Miller* factors as set forth in *Holman* "undoubtedly lie ahead" this is only the case if the defendant can make a showing *Miller* applies to him. We must remand to allow defendant to put forward

evidence to support this claim. See *id.* at ¶ 48. "We find considering *Holman* now puts the proverbial cart before the horse." *Id.* at ¶ 52.

¶ 57     Defendant's petition was summarily dismissed as being frivolous and patently without merit by the trial court in first stage proceedings. We are tasked with determining whether defendant's petition set forth a gist of an arguably constitutional claim that is not based on an indisputably meritless legal theory or fanciful allegations. See *Patterson*, 2018 IL App (1st) 160610, ¶ 15. We find defendant's postconviction petition is not based on fanciful factual allegations. Application of *Miller* requires a sentencing court to consider the defendant's youth and attendant characteristics and to determine that the defendant is "the rare juvenile offender whose crime reflects irreparable corruption" ((Internal quotation marks and citations omitted.) *Montgomery v. Louisiana*, 136 S. Ct. 718, 734 (2016)) before issuing a life or *de facto* life sentence. *Holman*, 2017 IL 120655, ¶ 46. Despite the trial court's consideration of voluminous evidence in mitigation of defendant's sentence, including evidence related to some of the *Miller* factors, the trial court did not find defendant was incorrigible. The trial court did consider defendant's rehabilitative potential. However, the trial court did not find defendant was that rarest of individuals for whom a court may forswear altogether the rehabilitative ideal because he forever will be a danger to society by imposing a life sentence. See *Montgomery*, 136 U.S. at 733-34; *supra*, ¶ 17.

¶ 58     Nor is defendant's petition based on an indisputably meritless legal theory. There are now a number of Illinois appellate court opinions reversing first-stage summary dismissals and denials of motions seeking leave to file a successive postconviction petition finding life and *de facto* life sentences of defendants who were young adults at the time of their offense could be deemed unconstitutional where their youth and rehabilitative potential had not been considered.

See, *e.g. House,* 2019 IL App (1st) 110580-B, ¶¶ 63-64; *People v. Savage*, 2020 IL App (1st) 173135, ¶¶ 74-78 (finding the trial court did not consider the attributes of young adulthood, explaining "We do not fault the sentencing judge. He could not have looked into a crystal ball in 1995 and have foreseen the statements concerning young adulthood that his court would later make [with respect to the still developing young adult brain]"); *People v. Franklin*, 2020 IL App (1st) 171628, ¶¶ 68-73; *People v. Daniels*, 2020 IL App (1st) 171738, ¶¶ 25-34 (stating "In the past five years *** our supreme court has twice acknowledged that young adults—at least those who were 20 years of age or younger at the time of their crimes—may still rely on the evolving neuroscience and societal standards underlying the rule in *Miller* to support as-applied challenges to life sentences brought pursuant to the Illinois proportionate penalties clause."); *Ruiz*, 2020 IL App (1st) 163145, ¶¶ 38-40; *People v. Johnson*, 2020 IL App (1st) 171362, ¶¶ 17-27; *People v. Bland*, 2020 IL App (3d) 170705, ¶¶ 10-14; *People v. Carrasquillo*, 2020 IL App (1st) 180534, ¶ 109; *People v. Minniefield*, 2020 IL App (1st) 170541, ¶¶ 37-47.

¶ 59 As explained above, the petition filed in this case is not based on an indisputably meritless legal theory or fanciful allegations. We find defendant's constitutional claim has an arguable basis in fact and law. Defendant has met the low bar at this first stage where he is not required to prove his case and his allegations are to be accepted as true, has made the gist of an arguably constitutional claim that his sentence violates the Proportionate Penalties Clause as applied to him. See *id.* Therefore, we reverse the trial court's summary dismissal of defendant's postconviction petition and remand the cause back to the trial court for second stage proceedings to give defendant an opportunity to establish that *Miller* applies to him.

¶ 60 We emphasize that our conclusion here does not in away way diminish the seriousness of the crimes for which defendant was convicted. We express no opinion as to the actual merits of

defendant's petition. Instead, we conclude only that defendant's postconviction petition should be advanced to the second stage of postconviction review.

¶ 61                              CONCLUSION

¶ 62    For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and remanded for appointment of postconviction counsel and second stage postconviction proceedings.

¶ 63    Reversed and remanded, with instructions.

¶ 64    JUSTICE BURKE, specially concurring.

¶ 65    I agree with the majority's conclusion that remand is warranted in this case for further proceedings based on the supreme court's decision in *People v. Harris,* 2018 IL 121932 and the numerous cases of this court interpreting *Harris*. However, I write separately in order to highlight a concerning trend that I have observed in the wake of the supreme court's decision in *Harris* as exemplified by the decision in the case at bar. In *Harris*, in addressing the young adult defendant's proportionate penalties challenge to his sentence based on *Miller v. Alabama*, 567 U.S. 460 (2012) on direct appeal, the court found that the defendant's claim was premature because the record did not contain evidence about how the defendant's brain development had been delayed such that *Miller* applied to his specific facts and circumstances. *Harris*, 2018 IL 121932, ¶ 46. The court found, however, that the defendant was "not necessarily foreclosed" from raising his as-applied constitutional challenge in another proceeding and specifically identified the Post-Conviction Hearing Act as a mechanism "designed to resolve constitutional issues." *Id.* ¶ 48. The court concluded that the defendant's claim would be more appropriately raised in another proceeding, such as a postconviction petition, but the court expressed no opinion on the merits of defendant's claim. *Id.*

¶ 66     Relying on this conclusion, dozens of panels of this court have reversed first stage summary dismissals of postconviction petitions and denials of petitions for leave to file successive postconviction petitions brought by young adult offenders alleging proportionate penalty challenges under *Miller* and its progeny. See, *e.g.*, *People v. Savage*, 2020 IL App (1st) 173135 (initial petition); *People v. Minniefield*, 2020 IL App (1st) 170541 (successive petition); *People v. Johnson*, 2020 IL App (1st) 171362 (successive petition). In the majority of these cases, including the case at bar, the young adult defendant does not submit any documentation or affidavits or other evidence showing that his *specific* brain development has been delayed and that *Miller* applies to his *specific* facts and circumstances, but instead raises blanket challenges to his sentence based on his young age and the "evolving science on brain development." See, *e.g.*, *Savage*, 2020 IL App (1st) 173135 ¶ 71, *People v. Ruiz*, 2020 IL App (1st) 163145, ¶ 56; *People v. Daniels*, 2020 IL App 171738, ¶ 9. These are the same sort of generalized allegations that the supreme court found problematic in *Harris*. Nonetheless, this court has routinely remanded for further proceedings offering the defendant an opportunity to develop the record to show how *Miller* may apply to his specific facts and circumstances. *Supra* ¶ 59; see also, *e.g.*, *Ruiz*, 2020 IL App (1st) 163145, ¶ 2; *Johnson*, 2020 IL App (1st) 171362, ¶ 2. These rulings, like the decision in *Harris*, provide no instructions for *how* the defendant may make such a showing or provide any other standard. It is unclear whether defendant must present affidavits or medical records or even expert testimony to demonstrate how this evolving science on brain development applies specifically to him. It is clear, however, that "basic information" about defendant's education, drug use, and background, such as that contained in a presentence investigation report, is insufficient to carry defendant's burden. *Harris,* 2018 IL 121932, ¶ 46.

¶ 67 We are therefore left with a situation where this court is issuing virtually blanket remands with absolutely no indication of how the defendant may meet his burden on remand. More troubling still is that defendants are filing these petitions and this court is granting these remands without any indication that these young adult defendants *could* meet whatever that nebulous burden may be. On this point, I find the fifth district court's recent decision in *People v. White*, 2020 IL App (5th) 170345 illustrative. Although that case involved a successive postconviction petition and the court analyzed defendant's claim under the stricter cause-and-prejudice standard, I find the court's explanation of why defendant failed to meet his burden to file his successive petition is relevant here. In *White*, this court found the defendant's "flat allegation as to evolving science on juvenile maturity and brain development" was insufficient to satisfy his burden to file a successive petition. *Id.* ¶ 24. The court continued:

"Other than generally asserting studies that show that sometimes youthfulness can extend into a person's twenties, the defendant does not now allege how he was particularly affected by any immaturity, and it is undisputed that he did not suffer from any cognitive or developmental impairments. Further, the allegations relating to his family history do not rise to the level of special circumstances that would provide a compelling reason to advance his successive postconviction petition." *Id.*

The court concluded that the defendant's contentions amounted to a claim that the sentencing court did not adequately consider his youth in sentencing, which was more akin to a claim that the sentencing court abused its discretion rather than a constitutional claim cognizable under the Post-Conviction Hearing Act. *Id.* ¶ 30.

¶ 68 I find the ruling in *White* well-reasoned and would suggest that the same analysis could also be applied to initial postconviction petitions. Although, as the majority discusses at length,

the bar for surviving first stage proceedings on initial postconviction petitions is not onerous, I believe the defendant still should be required to present some evidence or documentation suggesting that if the matter proceeded to an evidentiary hearing, defendant would be able to present some evidence that his brain development had been delayed and that *Miller* applied to his specific facts and circumstances as required for an as-applied constitutional challenge. Indeed, section 122-2 of the Post-Conviction Hearing Act requires the petitioner to either attach affidavits, records, or other evidence supporting the allegations or explain their absence. 725 ILCS 5/122-2 (West 2016). The limited material defendant attached to his petition in this case cannot be said to support his assertion that his brain development was delayed such that *Miller* applies to his specific facts and circumstances.

¶ 69    The majority in this case seems to suggest, however, based in part on this court's rulings in *House* and *Ruiz*, that any young adult petitioner who raises as an as-applied proportionate penalties challenge to his life or *de facto* life sentence under *Miller* is automatically entitled to an evidentiary hearing provided they make some general claim regarding the evolving science on brain development. That simply cannot be the standard. For its part, *House* involved an extraordinary set of circumstances and I do not believe the reasoning in that case is applicable in the case at bar. The defendant in *House* was 19 years old and, because of the sentencing structure, was sentenced to a mandatory life sentence despite the fact that he acted only as the lookout while members of his gang shot two individuals. *House*, 2019 IL App (1st) 110580-B, ¶¶ 5, 14, 17, 19. The *House* court distinguished the supreme court's ruling in *Harris* by noting that the defendant in *Harris* was the "actual shooter," while defendant House was convicted under a theory of accountability. *Id.* ¶ 32. Notably, in *House*, the court did not merely remand for further postconviction proceedings to give the defendant an opportunity to develop the record, but instead

vacated defendant's sentence outright and remanded for a new sentencing hearing. *Id.* ¶ 65. In reaching this conclusion, the *House* court relied extensively on the supreme court's decision in *People v. Leon Miller*, 202 Ill. 2d 328 (2002) (*Leon Miller*). In *Leon Miller*, the supreme court found that a juvenile defendant's mandatory sentence of natural life imprisonment violated the proportionate penalties clause where the defendant was convicted under a theory of accountability. *Id.* at 337, 341. The 15-year-old defendant in *Leon Miller*, like the defendant in *House*, acted as a lookout during the shooting, but never handled a gun. *Id.* at 341. Nonetheless, he was sentenced to a mandatory term of life imprisonment without the possibility of a parole. *Id.* The supreme court found that such a sentence "grossly distort[ed] the factual realities of the case and [did] not accurately represent defendant's personal culpability." *Id.* With regard to the defendant's culpability, the supreme court stated that the defendant was "the least culpable offender imaginable, a 15-year-old who had 'about a minute from the time this plan began until the act was completed by other persons.' " *Id.*

¶ 70    In this case, defendant was "far from the 'least culpable offender imaginable.' " *White*, 2020 IL App (5th) 170345, ¶ 28. Rather, defendant conspired with his co-defendants to tie up and rob Vanston and knew before Vanston arrived at the apartment that Smith and Crowder intended rob him. When Vanston arrived, Smith forced Vanston to the ground and defendant tied up Vanston's arms and legs. He then helped Crowder and Smith carry Vanston to the garage. The men then beat Vanston with a crowbar despite Vanston telling them that he would give them whatever they wanted and begging for his life. Smith then poured gasoline on Vanston and defendant provided Smith with a match in order to light Vanston on fire. Defendant testified that he knew that Smith was either going to burn Vanston or the garage, but he supplied him with the match anyway. After putting out the fire because some paper nearby caught fire, defendant helped

Smith put Vanston into the trunk of Vanston's vehicle. After Crowder stabbed Vanston twice, defendant helped Smith and Crowder bury Vanston alive near a sewer where Vanston later died of his injuries. Defendant then helped Crowder and Smith burgle Vanston's residence. The next day, defendant and his co-defendants used Vanston's credit card to purchase clothing and gasoline. Defendant was therefore an active participant in the crime and physically committed the offense. As this court noted in *People v. Handy*, "[w]hether a defendant physically committed the offense is a significant consideration for courts tasked with deciding whether to extend *Miller* principles to a young adult under the proportionate penalties clause." *People v. Handy*, 2019 IL App (1st) 170213, ¶ 40 (citing *People v. Pittman*, 2018 IL App (1st) 152030, ¶ 38). The extraordinary circumstances in *House*, a minimally involved 19-year-old defendant and a mandatory life sentence, are not present in this case, and I believe the majority erred in relying on the reasoning in that case here.[1]

¶ 71    Rather than representing a sea change in the way this court analyzes and resolves as-applied, *Miller*-based constitutional challenges by young adult offenders, I believe *House* was an

---

[1]I note that *Ruiz*, which the majority cites with approval, disagrees with the distinguishing factors in *House*—the defendant's level of participation in the offense and whether the sentence was discretionary or mandatory—that this court identified in *Handy*. *Handy*, 2019 IL App (1st) 170213, ¶¶ 40-41. However, I believe that *Ruiz* was wrongly decided and should not be followed. Numerous cases from this court have distinguished *House* on exactly those grounds and I find the reasoning in those cases to be persuasive. See, *e.g.*, *White*, 2020 IL App (5th) 170345, ¶¶ 27-28 (distinguishing the ruling in *House* on the basis that the defendant was the principal and not convicted under a theory of accountability); *People v. Ramsey*, 2019 IL App (3d) 160759, ¶ 23 (same); see also, *Pittman*, 2018 IL App (1st) 152030, ¶ 37-38 (distinguishing the ruling in *House* on the basis that the defendant was the principal and not convicted under a theory of accountability); *Thomas*, 2017 IL App (1st) 142557, ¶ 34 (same); *People v. Ybarra*, 2016 IL App (1st) 142407, ¶ 27 (same).

In addition, the young adult defendant in *Ruiz* was sentenced to a 40-year term. Even if the offender in *Ruiz* were a juvenile, his 40-year sentence would not have been a *de facto* life sentence and he would not have been entitled to *Miller*-based sentencing protections. *People v. Buffer*, 2019 IL 122327, ¶ 40. Rather than follow this precedent, the *Ruiz* court adopted an "age of release" standard in determining that Ruiz's 40-year sentence amounted to a *de facto* life sentence. *Ruiz*, 2020 IL App (1st) 163145, ¶¶ 43-45. This flawed reasoning is yet another reason that I believe *Ruiz* should not be followed.

outlier, decided on its specific facts and circumstances with limited applicability to other situations. I would also be remiss if I did not mention that the supreme court granted the State's petition for leave to appeal in *House*. *People v. House*, No. 125124 (Jan. 29, 2020). Perhaps that decision, which is currently pending before the supreme court, will provide further guidance for this court and the circuit courts in resolving these types of claims. In the interim, it appears the most practical solution is to do as the majority in this case has done and remand for further proceedings. Although there will undoubtedly be many meritless evidentiary hearings, the supreme court's ruling in *Harris* suggests that young adult defendants should be afforded an opportunity to show that *Miller* applies to their specific facts and circumstances at an evidentiary hearing. Accordingly, I find that defendant in this case should be afforded that opportunity and I concur with the majority's decision to remand.