NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190598-U

NO. 4-19-0598

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

Rule 23 filed July 15, 2021

Modified upon denial of
Rehearing October 13, 2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| BRIAN E. PRUITT, | ) | No. 95CF493 |
| Petitioner-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas M. O'Shaughnessy, |
| | ) | Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Cavanagh and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held:*   The appellate court affirmed the trial court's judgment because defendant was
properly sentenced to life in prison.

¶ 2    In August 1996, the trial court sentenced the then 17-year-old defendant, Brian E.

Pruitt, to mandatory life in prison for murdering both of his grandparents in October 1995. In 2013,

defendant filed a postconviction petition in which he requested a new sentencing hearing pursuant

to *Miller v. Alabama*, 567 U.S. 460 (2012), because his mandatory life sentence for crimes

committed when he was a juvenile violated the eighth amendment of the United States

Constitution.

¶ 3    The trial court ultimately granted the petition and, in June 2019, conducted

defendant's resentencing hearing. The court again sentenced defendant to life in prison.

¶ 4    Defendant appeals, arguing that (1) the trial court erred when it decided that the

rule announced in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), did not apply at defendant's resentencing hearing, (2) the trial court erred by sentencing defendant to life in prison after finding him permanently incorrigible based upon the nature of the offenses but without finding he was beyond rehabilitation, and (3) defendant received ineffective assistance of counsel because his attorney (a) proceeded under the 1995 first degree murder sentencing statute and (b) later failed to seek to proceed pursuant to the 2019 first degree murder sentencing statute. We disagree and affirm.

¶ 5                                    I. BACKGROUND

¶ 6                                    A. The Charges

¶ 7            In October 1995, the State charged defendant with six counts of first degree murder pursuant to section 9-1(a)(1) of the Code of Criminal Procedure of 1961 (720 ILCS 5/9-1(a)(1) (West 1994)) and two counts of first degree murder pursuant to section 9-1(a)(2) (*id.* § 9-1(a)(2)). Generally, the charges alleged that defendant murdered both of his grandparents by stabbing them.

¶ 8                                    B. The Trial

¶ 9            Because the evidence at trial is not at issue in this appeal, we will summarize the evidence only to the extent necessary to provide context for the issues this appeal raises.

¶ 10           Defendant's mother, Karen Pruitt, lived with a man named Clyde Jones when defendant was very young. Jones introduced Karen to drugs and physically abused her and defendant. Jones would beat defendant and once stabbed Karen in front of defendant.

¶ 11           When defendant was six years old, Karen called the Illinois Department of Children and Family Services (DCFS) and surrendered defendant to the agency's foster care system. Less than a year later, defendant's grandparents, Roberta and Frank McNeely, learned defendant was not being well cared for at the foster home and had defendant transferred to their care.

¶ 12          Defendant lived with his grandparents for several years. When defendant was around 11 or 12 years old, he began to sneak out of his bedroom window and stay out late at night. When defendant was 13 years old, his grandparents had him removed from their home. They sent a police officer to pick defendant up from school and take him to DCFS because they did not want him anymore.

¶ 13          Defendant was moved to several group foster homes but had significant problems. Defendant sometimes tried to return to his grandparents' home, but when he did so, he was not allowed to stay. Eventually, defendant was admitted to a secure psychiatric facility in Illinois and then transferred to a secure psychiatric facility in Arizona. Defendant described his placement in the Arizona facility as "horrible" and said there were cockroaches and insects everywhere. When defendant misbehaved, he was drugged and tied to a bed or locked in a closet. At one point, he pulled a fire alarm in an attempt to run away, and he was charged with criminal damage to property. Defendant was placed in juvenile detention in Arizona and was later transferred to a facility in Texas. Defendant successfully completed his placement in Texas when he was 16 years old and was then sent back to his grandparents' home in Illinois.

¶ 14          Not long after defendant's return to his grandparents' home, he began to have problems because he did not follow their rules. He drank alcohol, refused to follow curfew, refused to go to school, and threatened his grandparents. DCFS began to discuss placing defendant in another psychiatric hospital.

¶ 15          Ultimately, in October 1995, before defendant could be removed from his grandparents' home, he stabbed his grandparents one time each, killing them nearly instantly.

¶ 16          Shortly after the murders, the police arrested defendant. Keith Garrett, a Danville Police Department officer, interviewed defendant and described him as "nonchalant" and that he

did not "seem too concerned." In the interview, defendant said that on the day of the murders, he came home from school and met with Leta Pepper, a counselor contracted through DCFS. Defendant became upset with Pepper because "she was giving him a hard time about going to school and some other things."

¶ 17 Another officer, Gene Woodard, assisted with the interview. Woodard confronted defendant with the fact that his grandparents were dead and asked defendant what happened. Defendant cried and admitted he killed both of his grandparents. He said he stabbed his grandmother one time while she was asleep and waited about 15 to 20 minutes for his grandfather to come home before stabbing him in the back. Defendant then cleaned up the house with some towels and left, driving his grandfather's car, to dispose of the knife and towels. The officers asked defendant if he knew what he was doing was wrong. Defendant replied, "I didn't know I was doing it." Defendant explained that he would not want to hurt his grandparents because they were all he had.

¶ 18 The jury found defendant guilty of both murders. The trial court entered judgment on both counts of first degree murder and later sentenced defendant to mandatory life in prison because he had been convicted of murdering more than one person. See 730 ILCS 5/5-8-1(a)(1)(c)(2) (West 1994).

¶ 19 Defendant appealed, and this court affirmed the trial court's judgment. *People v. Pruitt*, No. 4-96-0722 (1997) (unpublished order under Illinois Supreme Court Rule 23). In 2001, defendant filed his first postconviction petition alleging the trial court erred when it sentenced him to life in prison based upon a finding that the murders were accompanied by brutal and heinous behavior. The trial court dismissed the petition at the first stage of proceedings, concluding defendant was sentenced to life in prison because he was convicted of murdering more than one

person. This court affirmed the trial court's judgment on appeal. *People v. Pruitt*, No. 4-01-0365 (2002) (unpublished order under Illinois Supreme Court Rule 23).

¶ 20                    C. Defendant's Successive Postconviction Petition

¶ 21        In June 2013, defendant sought leave to file a successive postconviction petition in which he asked for a new sentencing hearing pursuant to *Miller*. The State conceded that a new sentencing hearing was required, and the trial court granted a new sentencing hearing.

¶ 22        Prior to the sentencing hearing, the trial court asked the parties to submit authority on the applicable sentencing statutes. Defendant's counsel filed a sentencing memorandum and stated that defendant elected "to be sentenced under the sentencing regime applicable at the time of the offense in October of 1995." Counsel argued that defendant was ineligible for consecutive sentences because the murders were committed in a single course of conduct and first degree murder was not an offense that triggered consecutive sentences.

¶ 23        Counsel also argued that defendant was ineligible for a life sentence under the 1995 statutes. First, counsel argued the 1995 sentencing provision was unconstitutional under *Miller* because it mandated a natural life sentence for a juvenile. Second, counsel argued the 1995 statutory scheme permitted a sentencing enhancement for brutal and heinous behavior only if the jury made such a factual finding. Counsel further argued that it would be a violation of *Apprendi* for the court to make these findings at the sentencing hearing. Counsel also argued that defendant should not be sentenced to a discretionary life sentence because he was not permanently incorrigible.

¶ 24        The trial court concluded that defendant was eligible for a discretionary life sentence based upon the 1995 first degree murder sentencing statute if the court considered the factors in section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West

2018)). The court also decided that (1) *Apprendi* did not apply to defendant's case and (2) the court could make findings to increase defendant's sentence. Further, the court determined that defendant could be sentenced to consecutive sentences if the court found "that the offenses were *** not committed *** as a part of a single course of conduct during which there was no substantial change in the nature of the criminal objective."

¶ 25                    D. Defendant's Resentencing Hearing

¶ 26            In May 2019, the trial court conducted defendant's resentencing hearing. The State called the police officers who responded to the scene of the murders and who interviewed defendant after the murders. The State also introduced a summary of defendant's records from the Illinois Department of Corrections, DCFS, and a letter defendant's grandmother once wrote to DCFS in which she expressed fear about defendant's behavior and her desire that he be removed from her home.

¶ 27            Defendant called his mother to testify. She said that defendant had improved since he first went to prison. She testified that if defendant were released, she would be able to help him rebuild his life. Defendant called additional witnesses who testified about how defendant had become a better person.

¶ 28            Defendant testified about his childhood, his grandparents, and his experiences with DCFS. He acknowledged his disciplinary record while in prison but noted that he had not received any disciplinary tickets since 2010 and his only ticket for "physical violence" was a 1998 ticket he received for throwing water on a prison guard and spitting on him. Defendant explained he stopped getting tickets because he learned to deal with bad situations in more productive ways. Defendant described his life in prison and noted that he took classes about constructive problem solving and the impact of crime on victims and their families. The court asked defendant about his

grandparents, and he said that he missed them and loved them. Defendant described the ways in which he believed he had changed since he committed the murders.

¶ 29 The trial court concluded that the State proved beyond a reasonable doubt that defendant's offenses were accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. The court decided that the law did not limit the imposition of a life sentence to murders involving torture or the infliction of unnecessary pain but included murders in which the defendant acted with premeditated, cold-blooded deliberation. The court noted that defendant "chose as his weapon a large-bladed kitchen knife, intending to inflict pain and suffering on his victim." The court described the pain and suffering that the grandparents must have felt during their murders.

¶ 30 The trial court stated that it considered the statutory factors in aggravation and mitigation and found no factors in mitigation applied. In aggravation, the court considered defendant's prior adjudication for criminal damage to property in Arizona. The court then addressed the statutory factors under section 5-4.5-105 of the Unified Code of Corrections. The court found that defendant was 16 years, 9 months old at the time of the murders. The court stated the following:

> "The court has found the defendant's offenses were accompanied by exceptionally brutal and heinous behavior, indicative of wanton cruelty. The defendant's acts against unarmed, unsuspecting victims were premeditated, cold-blooded, unprovoked, deliberate, devoid of mercy, and without remorse. The court, recognizing the attendant characteristics of youth, include a lack of maturity and fully developed sense of responsibility, leading to behavior that is careless, impulsive, and reckless, finds the defendant's crimes were not the product of

impetuous, impulsive, nor spontaneous behavior. Instead, they were considered, planned and cautious, each committed against unsuspecting victims with heavy, massive force.

The court further finds these crimes do not reflect unfortunate, yet transient immaturity, but rather they are premeditated, cold-blooded, unprovoked, deliberate nature, coupled with the fact that each was devoid of mercy and without remorse are the uncommon crimes Justice Kagan noted, reflect an irreparable corruption and demonstrate irretrievable depravity."

¶ 31　　　　The trial court specifically stated that "it ma[de] no findings under 730 ILCS 5/5-8-4, with respect to whether the Defendant is eligible for consecutive sentences."

¶ 32　　　　The trial court resentenced defendant to life in prison.

¶ 33　　　　This appeal followed.

¶ 34　　　　　　　　　　　　　　II. ANALYSIS

¶ 35　　　　Defendant appeals, arguing that (1) the trial court erred when it decided that the rule announced in *Apprendi* did not apply at defendant's resentencing hearing, (2) the trial court erred when it sentenced defendant to life in prison after finding him permanently incorrigible based upon the nature of the offenses he committed without finding he was beyond rehabilitation, and (3) defendant received ineffective assistance of counsel because his attorney (a) proceeded under the 1995 first degree murder sentencing statute and (b) later failed to seek to proceed pursuant to the 2019 first degree murder sentencing statute. We disagree and affirm.

¶ 36　　　　We disagree because (1) *People v. Davis*, 2014 IL 115595, 6 N.E.3d 709, authorized the trial court to utilize its discretion to sentence defendant to a natural life sentence, (2) the trial court properly exercised its discretion, and (3) defendant did not receive ineffective

assistance of counsel.

¶ 37             A. The Trial Court Was Authorized to Use Its Discretion

to Sentence Defendant to Life in Prison

¶ 38        Defendant's argument that *Apprendi* should have applied to this case is controlled by the Illinois Supreme Court's decision in *Davis*. *Apprendi* held that facts that would increase "the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. Defendant's argument is belied by the fact that in *Davis*, the Illinois Supreme Court specifically noted that "*Miller* does not invalidate the penalty of natural life without parole for multiple [murders], only its *mandatory* imposition on juveniles." (Emphasis in original.) *Davis*, 2014 IL 115595, ¶ 43.

¶ 39        The State argues that defendant's contention that a jury would need to make a factual finding first is a "red herring" because "natural life remained a statutorily authorized sentence, based on double murder." In defendant's reply brief, defendant responds only that (1) the pertinent portion of *Davis* is *obiter dictum* and (2) "[n]othing in the *Davis* decision forecloses [defendant's] *Apprendi* argument." The first argument is unconvincing; even if the statement was *obiter dictum*, we would still follow the wisdom of the Illinois Supreme Court unless confronted with a very good reason to not do so. The second argument misses the mark.

¶ 40        Just as in *Davis*, the trial court in this case originally sentenced defendant to life in prison because defendant was convicted of murdering multiple people. See 730 ILCS 5/5-8-1(a)(1)(c)(2) (West 1994). However, unlike in *Davis*, the court in this case did describe defendant's brutal and heinous conduct at resentencing. But that does not change the fact that defendant was still subject to a discretionary life sentence because he murdered two people. "*Miller* does not invalidate the penalty of natural life without parole for multiple [murders], only its

*mandatory* imposition on juveniles." (Emphasis in original.) *Davis*, 2014 IL 115595, ¶ 43. Therefore, any error that the trial court made in discussing defendant's brutal and heinous conduct was harmless.

¶ 41 In other words, we conclude that *Davis* clearly stands for the proposition that a minor defendant may be sentenced to life in prison at the trial court's discretion.

¶ 42 B. The Trial Court Properly Exercised Its Discretion

to Sentence Defendant to Life in Prison

¶ 43 1. *The Law*

¶ 44 "Under *Miller* and *Montgomery* [*v. Louisiana*, 577 U.S. 190 (2016)], a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *People v. Holman*, 2017 IL 120655, ¶ 46, 91 N.E.3d 849. However, the decision in *Miller* did not impose a formal factfinding requirement. *Id.* ¶ 39. Thus, the trial court is not required to make specific "findings of fact regarding a juvenile's incorrigibility[.]" *Id.* (citing *Montgomery*, 577 U.S. at 211). Indeed, "no 'magic words' are required." *People v. Lusby*, 2020 IL 124046, ¶ 31.

¶ 45 The United States Supreme Court very recently analyzed this issue in *Jones v. Mississippi*, 593 U.S. ___, 141 S. Ct. 1307, 1315 (2021), in which the defendant, Jones, argued "that the Constitution similarly requires a sentencer to find permanent incorrigibility before sentencing a murderer under 18 to life without parole." Justice Kavanaugh, writing for the majority, summarized the Supreme Court's holding as follows:

"In short, *Miller* followed the Court's many death penalty cases and

required that a sentencer consider youth as a mitigating factor when deciding

whether to impose a life-without-parole sentence. *Miller* did not require the sentencer to make a separate finding of permanent incorrigibility before imposing such a sentence. And *Montgomery* did not purport to add to *Miller*'s requirements." *Id.* at __, 141 S. Ct. at 1316.

¶ 46                                  2. *This Case*

¶ 47          Defendant contends that the trial court improperly sentenced defendant to life in prison because it "based its decision on the nature of the offenses *** without finding that [defendant] could not be rehabilitated." Defendant continues, "In doing so, the sentencing court failed to follow *Miller* and its progeny because its finding that [defendant] was one of 'the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility,' and who are completely incapable of ever achieving rehabilitation was not made after a careful consideration of the *Miller* factors." We disagree.

¶ 48          We need not reiterate the entirety of the trial court's discussion. It suffices to note that the trial court described "the attendant characteristics of youth" but concluded that defendant's offenses "do not reflect unfortunate, yet transient immaturity, but rather their premeditated, cold-blooded, unprovoked, deliberate nature, coupled with the fact that each was devoid of mercy and without remorse[.]" The court then explicitly stated that that made defendant's offenses "the uncommon crimes Justice Kagan noted, [which] reflect an irreparable corruption and demonstrate irretrievable depravity."

¶ 49          Defendant relies heavily upon *People v. Paige*, 2020 IL App (1st) 161563, 155 N.E.3d 543, in which the First District reversed the trial court's judgment because "the trial court focused on the brutality of the crime and the need to protect the public, with no corresponding consideration given to defendant's opportunity for rehabilitation[.]" *Id.* ¶ 40. However, unlike in

*Paige*, the trial court in this case specifically discussed defendant's premeditation and lack of remorse in the context of whether he was permanently incorrigible. The trial court explained the attendant characteristics of youth and contrasted them with defendant's deliberate, intentional, premeditated murders. In other words, the court did provide "corresponding consideration" for defendant's opportunity for rehabilitation. See *id.* For that reason, we conclude that this case is readily distinguishable from the facts in *Paige*.

¶ 50        As Illinois courts have stated, and as the Supreme Court recently clarified in *Jones*, no formal finding of fact is constitutionally required. In light of all of those decisions, the trial court's deliberation and discussion during sentencing was more than adequate.

¶ 51        We conclude that the trial court properly used its discretion to sentence defendant to life in prison.

¶ 52        C. Defendant Did Not Receive Ineffective Assistance of Trial Counsel

¶ 53        Defendant argues that he received ineffective assistance of counsel because his attorney (1) proceeded under the 1995 first degree murder sentencing statute and (2) later failed to seek to proceed pursuant to the 2019 first degree murder sentencing statute. We disagree.

¶ 54        Defendant contends that counsel was ineffective because the 1995 first degree murder sentencing statute "permitted him to be sentenced to life in prison[.]" However, an essential element of an ineffective assistance of counsel claim is prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate prejudice, a defendant must show " 'that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " *People v. Moore*, 2020 IL 124538, ¶ 29, 161 N.E.3d 125 (quoting *People v. Domagala*, 2013 IL 113688, ¶ 36, 987 N.E.2d 767 (quoting *Strickland*, 466 U.S. at 687)). " 'The likelihood of a different result must be substantial, not just conceivable.' " *People v. Pope*,

2020 IL App (4th) 180773, ¶ 63, 153 N.E.3d 1055 (quoting *Harrington v. Richter*, 562 U.S. 110, 112 (2011). " 'A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness.' " *Id.* (quoting *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601).

¶ 55 The problem for defendant is that he was found guilty of two first degree murders. The absolute minimum sentence for a single charge of first degree murder is 20 years in prison and, without further enhancements, the penalty can be up to 60 years in prison. 730 ILCS 5/5-4.5-20 (West 2018). This means that a consecutive sentence for defendant's crimes could total up to 120 years in prison, far beyond the natural life of any person.

¶ 56 Although the trial court could have conceivably sentenced defendant to as little as 20 years in prison, the prospect of that sentence was exceedingly unlikely. See *Pope*, 2020 IL App (4th) 180773, ¶ 63 (merely "conceivable" that different outcome could occur is not sufficient to demonstrate prejudice). The court could have sentenced defendant more leniently than it did at the resentencing hearing but chose to sentence defendant to life in prison. Nothing about sentencing defendant as we have described would likely change the trial court's determination that defendant should spend the rest of his life in prison, a determination the court expressed in the strongest possible terms.

¶ 57 At oral argument, defendant contended that (1) under the 1995 law for consecutive sentencing, multiple convictions of first degree murder did not require mandatory consecutive sentences and (2) the trial court could not have sentenced defendant to consecutive sentences because the murders were carried out in a single course of conduct.

¶ 58 The 1995 statute concerning consecutive and concurrent sentencing states the following: "The court shall not impose consecutive sentences for offenses which were committed

as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective." 730 ILCS 5/5-8-4(a) (West Supp. 1995).

¶ 59 Two cases help illustrate what counts as a single course of conduct. In *People v. Embry*, 249 Ill. App. 3d 750, 619 N.E.2d 246 (1993), this court concluded that the defendant committed two sexual assaults in a single course of conduct because the evidence showed that the assaults occurred in the same room and all within 10 minutes. Meanwhile, the Third District in *People v. Bell*, 259 Ill. App. 3d 572, 630 N.E.2d 1335 (1994), noted this court's decision in *Embry* but concluded that the sexual assaults committed by the defendant in *Bell* did not constitute a single course of conduct. The Third District distinguished *Bell* from *Embry* as follows: "In the instant case, by contrast, the offenses occurred in different rooms, and there was no testimony as to how far apart in time they were." *Id.* at 573.

¶ 60 In the present case, defendant killed his grandmother and then waited some time (according to his confession, at least 15 to 20 minutes) for his grandfather to return home before killing him as well. We conclude that this case is more similar to the facts in *Bell* than the facts in *Embry* because, unlike in *Embry*, a clear break occurred in this case during which time passed between the two murders. These were separate acts not arising out of a single course of conduct. Accordingly, the "single course of conduct" rule would not bar the trial court from imposing consecutive sentences.

¶ 61 We agree with the following assessment by the First District: "We do not believe that the single course of conduct rule was adopted to free a defendant from the consequences of a series of crimes, involving separate acts, committed against several individuals. Such [a] rule would encourage multiple homicides since no greater sentence could be imposed for a second or third killing." *People v. Lindsay*, 67 Ill. App. 3d 638, 647, 384 N.E.2d 793, 800 (1978).

- 14 -

¶ 62    For the reasons stated, we conclude that defendant suffered no prejudice; accordingly, he cannot prevail on his ineffective assistance of counsel claim.

¶ 63                              D. Forfeiture

¶ 64    Last, defendant contended in his reply brief and at oral argument that the State had forfeited numerous arguments it made for the first time at oral argument. We addressed those arguments on their merits in this order.

¶ 65    We agree that it is bad form for the State to fail to address defendant's arguments directly and fully in it's brief. The principle of forfeiture exists, in part, to avoid surprise or ambush during arguments. However, upon questioning at oral arguments, counsel from both parties handled the arguments well, such that we felt comfortable addressing the arguments on their merits as we have done.

¶ 66    "Forfeiture is a limitation on the parties, not the court. In the exercise of our discretion, we may address even forfeited issues." *People v. Custer*, 2019 IL 123339, ¶ 19, 155 N.E.3d 374. In this case, we exercise our discretion to consider the arguments on their merits.

¶ 67                             III. CONCLUSION

¶ 68    For the reasons stated, we affirm the trial court's judgment.

¶ 69    Affirmed.