# Illinois Official Reports

## Appellate Court

---

**People v. Paige, 2020 IL App (1st) 161563**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MELVIN PAIGE, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-16-1563 |
| Filed | March 20, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 99-CR-22106; the Hon. Mark W. Martin, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Therese Bissell, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Brian K. Hodes, and Miles J. Keleher, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Presiding Justice Mikva and Justice Connors concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Melvin Paige, appeals the circuit court's denial of leave to file a successive postconviction petition where his petition established that he was 16 years old when he committed the offense and his *de facto* life sentence of 50 years' imprisonment without consideration of the factors required under *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016), was unconstitutional. For the following reasons, we reverse and remand for a new sentencing hearing.

## I. JURISDICTION

¶ 2

¶ 3    The trial court denied leave to file a successive postconviction petition on May 20, 2016. Defendant filed a notice of appeal on June 6, 2016. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from a final judgment of conviction in a criminal case entered below.

## II. BACKGROUND

¶ 4

¶ 5    We set forth facts relevant to this appeal. Defendant was convicted of first degree murder, home invasion, and residential burglary in the stabbing death of Emil Mennes. Defendant was 16 years old at the time. At defendant's trial, Bernice O'Brien testified that she lived in the same condominium complex as Mr. Mennes. On August 25, 1999, she was going to the laundry room on the second floor when she noticed a strong smell in the hallway. As she passed Mr. Mennes's doorway, she noticed that the smell was "really strong there."

¶ 6    After putting her laundry in the washers, O'Brien knocked on the door of Mr. Mennes's neighbor, Kay Lichon, who lived across the hall. She told O'Brien that she had not seen Mr. Mennes for a couple of days. She had a key to his unit so they decided to go into his apartment to check on him. When O'Brien entered, she walked toward the living room and could see Mr. Mennes sitting in his chair with a blanket covering his head. His legs "were black up to the knee," and she told Lichon that she believed he was dead. They left the apartment and called 911.

¶ 7    Officer John Longo testified that he was an evidence technician and he arrived at the scene to take photographs. After pulling down the blanket to the victim's waist, Officer Longo "observed multiple stab wounds in the victim's torso and abdominal area." He saw more than 10 wounds in the area of the victim's chest, neck, and abdomen. Detective Steve Bratcher processed the crime scene and recovered other physical evidence.

¶ 8    Sergeant Michael Vargas testified that on September 10, 1999, he was notified that a person came into the police station asking for him. He returned to the station and saw defendant in the lobby. Defendant told Sergeant Vargas that he wanted to talk about the Mennes homicide. He took defendant into an interview room, and defendant told him, "I did the homicide." He said that "he did the homicide in his complex. He stabbed the old man." Sergeant Vargas stopped his conversation with defendant at that point and informed his commander, John Koziol, of defendant's admission.

¶ 9    After speaking with Commander Koziol, Sergeant Vargas and his partner returned to the interview room and advised defendant of his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S.

436 (1966)). Defendant stated that he understood each point and agreed to continue speaking with the officers. Defendant stated that on the night of August 20, 1999, he was doing laundry on the second floor of the condominium building. When he was in the hallway on the way to his apartment, he passed an older man who was his neighbor. He did not know the man's name. The man "sort of grimaced or smirked" at defendant, and defendant took his expression as "a racist and prejudiced gesture." Defendant became angry and went back to his grandmother's apartment to retrieve a kitchen knife.

¶ 10    Defendant waited in the stairway and after a few minutes saw Mr. Mennes enter his apartment through the front door. He checked the doorknob and found it was unlocked. However, defendant did not enter through the front but instead exited the building and went around to the outside of Mr. Mennes's balcony. From the balcony, defendant observed Mr. Mennes watching television. He waited for Mr. Mennes to get up from his chair before taking off his shirt and entering the apartment through the unlocked patio door. Defendant hid in the kitchen, and a few minutes later, Mr. Mennes returned to the living room to watch television. After he sat down in his chair, defendant snuck up from behind, put his shirt over Mr. Mennes's face, and then stabbed him "in the throat, chest, and stomach area repeatedly with the kitchen knife." As defendant stabbed him, he heard Mr. Mennes wheezing. Before leaving the apartment, defendant took a rosary from a nearby table. He wrapped the knife in his shirt and threw it down the laundry chute. Defendant told police that he left the rosary at his grandmother's apartment.

¶ 11    When asked why he had come to the police station to confess, defendant said that his head hurt and he could not sleep because of what he had done. He also "wanted to come strong and to stand up for having committed a murder."

¶ 12    Sergeant Vargas spoke with Assistant State's Attorney (ASA) Mary Beth Kinnerk and contacted defendant's mother, Kimberly Paige. Although defendant stated that he did not want his mother present during the interview with ASA Kinnerk, she was present for the interview along with Sergeant Vargas. As ASA Kinnerk wrote out defendant's statement, he told her that he had not been completely honest and "was just giving [them] s***t to see if [they] knew what [they] were talking about." He then stated that he used a letter opener instead of a kitchen knife to kill Mr. Mennes. He also stated that he entered the apartment through the front door and not the balcony. Regarding the actual attack, defendant's written statement contained substantially the same information as his statement to Sergeant Vargas, except he added that he put a blue blanket over the victim's head "so he didn't have to look at the blood and hear him wheezing." He also told police where they could find the rosary and the letter opener in his grandmother's apartment. Defendant signed the written statement and his mother also signed the statement.

¶ 13    The parties stipulated that if called to testify, the victim's son, Robert Mennes, would state that Mr. Mennes had suffered a stroke and sustained partial paralysis on the left side of his body. As a result, his face was somewhat disfigured. Evidence was also presented that defendant was enrolled in a special education program for students with learning disabilities and that his IQ of 78 fell within the borderline range of intellectual potential. Defendant also suffered from a substance induced mood disorder with depressive and psychotic features, as well as a conduct disorder.

¶ 14    After the jury found defendant guilty of first degree murder, home invasion, and residential burglary, the trial court held a sentencing hearing. The State presented victim impact

statements from Robert Mennes and the victim's daughter-in-law, Linda Conley. Defendant's presentence investigative report (PSI) indicated that he was arrested for a curfew violation when he was 14 years old and he completed one year of probation.

¶ 15     Defense counsel presented evidence in mitigation. Dr. Albert Stipes, a forensic psychiatrist, testified that he interviewed defendant and reviewed the police and school reports in the case. He found that defendant was "in the borderline range of intellectual ability," which "is less than average but he is not mentally retarded." He also "found a mild thought disorder," which was associated with his schizotypal personality type. It is a "life-long condition in which the person has odd or idiosyncratic speech and thought." Sometimes it is a "forerunner" to schizophrenia, but defendant did not have schizophrenia. He also found that defendant "had hallucinogen abuse" in that he has been "using LSD for two years and he used it every couple of months."

¶ 16     When asked what effect the mix of "youthful age, borderline intellectual functioning, and drug abuse" would have on defendant's thinking, Dr. Stipes stated that "it would certainly affect his judgment. His ability to make decisions would be poor. He might be impulsive. He might make decisions without much information to go on, and he would misinterpret things that he would see or hear." Dr. Stipes further stated that "the drug abuse problem is a condition that can be rehabilitated certainly by confinement and by a drug treatment program. The personality disorder, if it does not develop into a more serious condition, can be treated with counselling." Also, "[a]ge takes care of itself. The older he gets hopefully the more he learns. *** For most of us age makes us less impulsive."

¶ 17     Mary Anna Paige, defendant's grandmother, testified that defendant lived with her for approximately 10 years prior to his arrest. When he was 13 years old, his stepfather was killed in a head-on collision. Until that time, defendant had been active in school and participated in sports. He was close to his stepfather, and he "just changed after that. He didn't want to really participate in team sports, he didn't talk very much to people."

¶ 18     Kimberly Paige also testified. She apologized to the Mennes family for what they were going through and stated that her family has also been torn apart. She acknowledged that she and defendant's stepfather had an on-and-off relationship while he was alive, but they were not a broken family. She stated that she raised her family herself and works 10- to 12-hour days. She saved money and bought her family a home. She did not believe defendant committed this offense.

¶ 19     In closing, the State acknowledged that defendant was young but argued that "the fact that he is so young and he commits this act only shows what it can lead to." Defendant did not have a substantial criminal history, but "he didn't start out with something piddley [*sic*]. He starts out with the murder of a 78-year-old man alone in his house where you would *** hope you would be safe." Defense counsel, however, argued that defendant was suffering from a combination "of his age and immaturity, his borderline intellectual functioning and his drug abuse, and this caused him to be impulsive, to misrepresent events and to make decisions hastily based on inadequate information." Counsel asked the court "to consider [defendant's] youth, drug abuse, his intellectual deficiencies, the fact that he misperceived things *** because that was the condition that he was living under."

¶ 20     Defendant also spoke at the sentencing hearing. He apologized "for everything that has happened to the victim. And *** sorry, you know, to my family, my innocence haven't came

about [*sic*] but this is the way the justice system has seem to found [*sic*] me." Defendant stated that he is "a man of God. No longer a hoodlum" and that he "let [his] juvenile ways alone."

¶ 21  In imposing defendant's sentence, the trial court began by stating that "this has not been an easy case." The court reviewed its notes, the PSI report, victim impact statements, and the testimony by doctors of defendant's drug abuse, his mental condition, and his intellectual abilities. It noted that although defendant was taking "alternative classes," he "was doing well in some of them." The court "listened to the defendant's mother testify" and acknowledged that "her life has not been easy." It also referred to Mary Anna Paige's testimony and noted "[w]hat a strong woman she was" because "her daughter needed help, she took her daughter in, helped raise her daughter's children after she raised her son."

¶ 22  The court "took into consideration [defendant's] age at the time of the offense and now" and acknowledged that "he has not had an easy life having been raised a lot with a single parent." However, defendant did have a "strong male role model in his life" in his stepfather and "sort of a good family support system." The court noted defendant's substance abuse. The court "also considered the facts in the case," including "[t]he fact that the defendant laid in waiting for [Mr. Mennes], hid, the brutality of the act, 18 stab wounds, while the victim was sitting defenseless in his chair." The court found that there was "ample evidence of premeditation in this crime." It "took all these into consideration" and "weighed his rehabilitative potential as talked about here today versus the seriousness of this offense and the need to protect the public, especially the elderly public. That is a segment of our society in great need—in most need of protection." Defendant's "actions personified really the sum of all fears for homeowners. That is to die at the hands of a home invader."

¶ 23  The trial court sentenced defendant to 50 years' imprisonment for first degree murder, 25 years for home invasion to be served concurrently, and 15 years for residential burglary, to be served concurrently with the first degree murder sentence but consecutively to the home invasion sentence.

¶ 24  On direct appeal, defendant argued that (1) the trial court erred in denying his motion to suppress confession, (2) the trial court improperly shifted the burden of proof in determining whether his confession was voluntary, (3) the trial court erroneously excluded certain evidence as hearsay, (4) the trial court erroneously failed to conduct a *Krankel* inquiry (*People v. Krankel*, 102 Ill. 2d 181 (1984)), (5) his burglary conviction must be vacated because it arose from the same conduct as the home invasion conviction, (6) his sentence was excessive, and (7) the truth in sentencing statute is unconstitutional as applied to him. On December 28, 2004, this court affirmed defendant's convictions for first degree murder and home invasion but vacated his conviction for residential burglary. *People v. Paige*, No. 1-02-2768 (2004) (unpublished order under Illinois Supreme Court Rule 23).

¶ 25  On February 23, 2005, defendant filed a *pro se* postconviction petition alleging that (1) the trial court improperly considered multiple victim impact statements and (2) trial and appellate counsel were ineffective for failing to object and raise this issue. The court summarily dismissed the petition, but because it had not been ruled on within 90 days, this court remanded the case for second stage proceedings. The trial court subsequently granted the State's motion to dismiss, and this court granted appellate counsel's *Finley* motion (*Pennsylvania v. Finley*, 481 U.S. 551 (1987)) and affirmed the trial court's judgment. *People v. Paige*, No. 1-12-0538 (2013) (unpublished summary order under Illinois Supreme Court Rule 23(c)). Defendant did not appeal the dismissal.

¶ 26   On June 28, 2016, defendant filed a *pro se* motion for leave to file a successive postconviction petition. Defendant alleged that he was 16 years old at the time of the offense and his sentence of 50 years' imprisonment was a *de facto* life sentence that violated *Miller*. He argued that he is entitled to a new sentencing hearing. On May 20, 2016, the circuit court denied defendant's motion, finding that his 50-year sentence was not a *de facto* life sentence. Defendant filed this appeal.

¶ 27                   III. ANALYSIS

¶ 28   The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) sets forth a procedure to address the substantial violation of a defendant's constitutional rights in the proceedings that resulted in his conviction. Postconviction proceedings are collateral to proceedings in a direct appeal and are meant to address constitutional claims that could not have been previously adjudicated. *People v. Towns*, 182 Ill. 2d 491, 502 (1998). Thus, issues raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised, but were not, are forfeited. *People v. Ortiz*, 235 Ill. 2d 319, 328 (2009).

¶ 29   The Act contemplates the filing of a single petition. *People v. Bailey*, 2017 IL 121450, ¶ 15. Therefore, "[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." 725 ILCS 5/122-3 (West 2016). However, a successive postconviction petition may be allowed "when fundamental fairness so requires." (Internal quotation marks omitted.) *People v. Coleman*, 2013 IL 113307, ¶ 81. Defendant may file a successive petition raising a claim of actual innocence. *Id.* ¶ 83. Defendant may also file a petition alleging cause and prejudice by showing that (1) some objective factor external to the defense impeded his ability to raise the claim in a prior proceeding and (2) the claim not raised during the initial postconviction proceedings "so infected [the] trial that the resulting conviction [or sentence] violated due process." *Id.* ¶ 82; see 725 ILCS 5/122-1(f) (West 2016).

¶ 30   Defendant contends that the circuit court erred in denying him leave to file a successive petition where he has established cause and prejudice. He was only 16 years old at the time of the offense, and he received a *de facto* life sentence of 50 years' imprisonment. After defendant filed his initial postconviction petition, the United States Supreme Court issued *Miller*, in which it held that the eighth amendment forbids a mandatory sentence of life in prison for juvenile offenders whose crimes reflect " 'unfortunate yet transient immaturity.' " *Miller*, 567 U.S. at 479-80 (quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2005)). Defendant argues that he has shown cause and prejudice where cases decided after he filed his initial postconviction petition have found that a life sentence imposed on a juvenile defendant is unconstitutional.

¶ 31   We agree that defendant has established "cause" where he filed his initial postconviction petition before *Miller* was decided and *Miller*'s new substantive rule was "not available earlier to counsel." *People v. Davis*, 2014 IL 115595, ¶ 42. To establish prejudice, defendant must show that his life sentence was imposed in violation of *Miller*'s substantive rule. See *id.* ¶¶ 42-43 (finding that defendant has established prejudice where *Miller*'s new substantive rule retroactively applied to his sentencing hearing, and therefore his sentence of mandatory life in prison was invalid). Although defendant's sentence was not mandatory, our supreme court held that *Miller* also "applies to discretionary sentences of life without parole for juvenile defendants" because "[l]ife sentences, whether mandatory or discretionary, for juvenile defendants are disproportionate and violate the eighth amendment, unless the trial court considers youth and its attendant characteristics." *People v. Holman*, 2017 IL 120655, ¶ 40.

Furthermore, our supreme court recently determined in *People v. Buffer*, 2019 IL 122327, ¶ 41, that a prison sentence of more than 40 years constitutes a *de facto* life sentence for a juvenile offender. Therefore, defendant's sentence of 50 years' imprisonment for an offense he committed when he was 16 years old is a *de facto* life sentence subject to *Miller*'s substantive rule.

¶ 32        *Miller* makes clear that a sentence of life without parole is an unconstitutional penalty only for "juvenile offenders whose crimes reflect the transient immaturity of youth." *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734. Accordingly, *Miller* requires that courts consider a juvenile offender's "diminished culpability and heightened capacity for change" before imposing a sentence of life in prison. *Miller*, 567 U.S. at 479. To prevail on his *Miller* claim, defendant must show not only that he was sentenced to a lifetime in prison but also that "the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *Buffer*, 2019 IL 122327, ¶ 27. We find *Holman*, 2017 IL 120655, instructive.

¶ 33        In *Holman*, the defendant was convicted of first degree murder in the death of 83-year-old Esther Sepmeyer. She was found in a bedroom, in a pool of blood, kneeling and slumped over the side of the bed. She had been shot in the cheek. The house was ransacked, and valuables were missing. *Id.* ¶ 3. Several weeks later, defendant and Girvies Davis were arrested for an unrelated offense. Both gave inculpatory statements regarding their collaborative crime spree through two counties, and their accounts included Esther's murder. However, each person accused the other of being the shooter. *Id.* ¶ 5. Defendant's fingerprints were recovered and matched prints lifted from a mirror and cabinet in the bedroom. *Id.*

¶ 34        Defendant and Davis were tried together and on March 16, 1981, a jury found defendant guilty of first degree murder. Since defendant was 17 years old when he committed the offense, he was ineligible for the death penalty. The PSI prepared prior to sentencing indicated that defendant had a history of criminal activity from the age of 14, including other murders. Esther's murder occurred while he was on parole. *Id.* ¶ 7. The PSI also stated that defendant's father died when he was 7 years old and his stepfather died when he was around 16 years old. He had a close relationship with his mother and six siblings and had two young children of his own. He was "borderline" mentally deficient and had between seven and nine years of formal education. *Id.* ¶ 8. His probation officer stated that " 'defendant expressed no guilt for this offense or remorse for the victim, who was an 82[-]year[-]old woman who posed no physical threat to him.' " *Id.* Furthermore, his " 'history of senseless criminal acts of mortal violence toward others and lack of remorse for his victims indicates *** that the defendant has no predilection for rehabilitation.' " *Id.*

¶ 35        Defendant was also examined by two psychiatrists and a psychologist, and their reports were presented at his sentencing hearing. Defendant mentioned that in 1977 he fell from a two-story building and hit his head. Since then, he has had severe headaches " 'like dynamite ready to explode,' " and he took aspirin every day. *Id.* ¶ 11. Defendant had some neurological impairment and "a high probability of organic brain damage." *Id.* His attitude was " 'a mixture of extreme apprehension with a sense of hopelessness, some depression and maybe a touch of manipulativeness.' " *Id.* ¶ 10. Defendant "is at times not aware of his surroundings and is easily led into doing 'bad deeds.' " *Id.* ¶ 12. However, defendant did improve on intelligence tests and the improvement was attributed to " 'growing up in chronological age and maturation process of his central nervous system.' " *Id.* His verbal intelligence indicated that he had the capacity to make " 'socially appropriate judgment.' " *Id.*

¶ 36    In rendering defendant's sentence, the trial court stated that it " 'considered the factors enumerated in the Criminal Code [of 1961 (see Ill. Rev. Stat. 1979, ch. 38, ¶¶ 1005-5-3.1, 1005-5-3.2)] as factors in Mitigation and factors in Aggravation.' " *Holman*, 2017 IL 120655, ¶ 17. The court also considered the evidence presented in the case and at the sentencing hearing, as well as the arguments of counsel. It found that defendant " 'cannot be rehabilitated, and that it is important that society be protected from this Defendant.' " *Id.* The trial court sentenced defendant to a term of natural life imprisonment. *Id.* The appellate court subsequently affirmed defendant's sentence as constitutional under *Miller* because the trial court considered defendant's youth and its attendant characteristics before imposing a life sentence. *Id.* ¶ 22. Our supreme court allowed defendant's petition for leave to appeal. *Id.* ¶ 23.

¶ 37    Our supreme court noted that *Miller* " 'mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing ***' life imprisonment without the possibility of parole." *Id.* ¶ 37 (quoting *Miller*, 467 U.S. at 483). Although neither *Miller* nor *Montgomery* required sentencing courts to make findings of fact regarding a juvenile's incorrigibility, our supreme court agreed with other jurisdictions that "a trial court must consider some variant of the *Miller* factors before imposing a life sentence without the possibility of parole." *Id.* ¶¶ 39, 43-44. The factors include, but are not limited to

> "(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressure that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.* ¶ 46.

¶ 38    The court looked "at the cold record to determine if the trial court considered such evidence at the defendant's original sentencing hearing." *Id.* ¶ 47. The trial court was aware of defendant's young age, which was highlighted by both the prosecutor and the defense attorney at the hearing. "The PSI and the psychological reports provided some insight into [defendant's] mentality but did not depict him as immature, impetuous, or unaware of risks." *Id.* ¶ 48. He was susceptible to peer pressure and had low intelligence, but there was no evidence that he was incompetent or could not communicate. He had a close relationship with his mother and siblings. However, the trial court found "that the defendant's conduct placed him beyond rehabilitation," and it sentenced him to life in prison without parole. *Id.* ¶ 50. Therefore, our supreme court held that "defendant's sentence passes constitutional muster under *Miller*." *Id.*

¶ 39    Although the trial court in this case "weighed his rehabilitative potential as talked about here today," it did not consider whether defendant was beyond rehabilitation so that he is one of "the rarest of juvenile offenders *** whose crimes reflect permanent incorrigibility." *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734; *Holman*, 2017 IL 120655, ¶ 50. The record here shows that evidence was presented on the potential for defendant's rehabilitation. Dr. Stipes opined that defendant's "drug abuse problem" can be rehabilitated "by confinement and by a drug treatment program. The personality disorder, if it does not develop into a more serious condition, can be treated with counselling." He also stated that "[a]ge takes care of itself. The older he gets hopefully the more he learns. *** For most of us age makes us less impulsive."

¶ 40    However, in imposing defendant's sentence, the trial court did not fully consider his potential for rehabilitation. It did not consider whether defendant's conduct reflected permanent incorrigibility. Rather, the court weighed heavily the specifics of the crime committed and the fact that the elderly public needed protection. Where the trial court focused on the brutality of the crime and the need to protect the public, with no corresponding consideration given to defendant's opportunity for rehabilitation, the imposition of a life sentence on a juvenile defendant was unconstitutional. *People v. Morris*, 2017 IL App (1st) 141117, ¶¶ 32-33. Since defendant's sentence was imposed in violation of *Miller*, he has established his *Miller* claim. Accordingly, we vacate defendant's unconstitutional sentence and remand for a new sentencing hearing where the trial court can determine whether defendant's crime reflected "permanent incorrigibility" or the "unfortunate yet transient immaturity" of youth. (Internal quotation marks omitted.) *Id.* ¶ 22.

¶ 41                                IV. CONCLUSION

¶ 42    For the foregoing reasons, the judgment of the circuit court is reversed and the cause remanded for a new sentencing hearing.

¶ 43    Reversed and remanded.