2023 IL App (1st) 220925-U

No. 1-22-0925

THIRD DIVISION
November 8, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 99 CR 2210601 |
| | ) | |
| MELVIN PAIGE, | ) | Honorable |
| | ) | Marc W. Martin, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE D. B. WALKER delivered the judgment of the court.
Presiding Justice Reyes and Justice R. Van Tine concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's sentence because the sentencing court properly considered the statutory mitigating factors applicable to juvenile offenders and defendant's sentence of 40 years in prison was not excessive.

¶ 2    Defendant Melvin Paige appeals his sentence of 40 years' imprisonment, imposed after a resentencing hearing ordered by this court in *People v. Paige*, 2020 IL App (1st) 161563. On appeal, defendant contends that (1) his sentence was excessive where the resentencing court

misapplied two of the mitigating factors relevant to juvenile offenders under section 5-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2020)), and (2) the resentencing court misapprehended the sentencing range applicable to him. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was charged with first degree murder, home invasion, and residential burglary in the stabbing death of Emil Mennes. Defendant was 16 years old at the time. The following evidence was presented at defendant's trial.[1]

¶ 5      On August 25, 1999, a neighbor with a key to Mennes' apartment discovered Mennes sitting upright in a chair with a blanket over his head. She and another neighbor called 911 and Officer John Longo arrived at the scene. When he pulled down the blanket, he observed more than 10 stab wounds to Mennes' chest, neck, and abdomen.

¶ 6     On September 10, 1999, Sergeant Michael Vargas spoke with defendant in the lobby of the police station. Defendant said that "he did the homicide in his complex. He stabbed the old man." Sergeant Vargas halted the conversation and returned with his partner to advise defendant of his *Miranda* rights. Defendant agreed to speak with them.

¶ 7     Defendant stated that on the night of August 20, 1999, he was doing laundry on the second floor of the condominium building. When returning to his apartment, he passed an older man who was his neighbor. It was Mennes, but at the time defendant did not know his name. Mennes "sort of grimaced or smirked" at defendant, who took the expression as "a racist and prejudiced gesture." Defendant became angry and went back to his grandmother's apartment to retrieve a kitchen knife.

---

[1]A full recitation of the facts in this case can be found in *Paige*, 2020 IL App (1st) 161563. We set forth only the facts relevant to this appeal.

¶ 8    Defendant waited in the stairway and after a few minutes, he observed Mennes enter his apartment through the front door. Although the door to Mennes' apartment was unlocked, defendant did not enter through the front door. Instead, he exited the building and walked to the balcony outside of Mennes' apartment. He observed Mennes sitting in his chair watching television. When Mennes left his chair, defendant took off his shirt and entered the apartment through the unlocked patio door. He hid in the kitchen and waited for Mennes to return to his chair. Defendant then came from behind, put his shirt over Mennes' face, and stabbed him "in the throat, chest, and stomach area repeatedly with the kitchen knife." As defendant stabbed, he heard wheezing from Mennes. Before leaving, defendant took a rosary from a nearby table.

¶ 9    Defendant went to the police station because his head hurt, and he could not sleep because of what he had done. He also "wanted to come strong and to stand up for having committed a murder."

¶ 10    Defendant gave a written statement to Assistant State's Attorney (ASA) Mary Beth Kinnerk with his mother, Kimberly Paige, present. Defendant told ASA Kinnerk that he had not been completely honest and "was just giving [them] s**t to see if [they] knew what [they] were talking about." He stated that he used a letter opener instead of a kitchen knife to kill Mennes. He also entered the apartment through the front door and not the balcony. Regarding the actual attack, defendant's written statement was substantially the same as his statement to Sergeant Vargas, except he told ASA Kinnerk he put a blue blanket over Mennes' head "so he didn't have to look at the blood and hear him wheezing." He also told police where they could find the rosary and the letter opener in his grandmother's apartment. Defendant and his mother signed the written statement.

¶ 11 Defendant's trial commenced on March 19, 2002. The parties stipulated that if called to testify, the victim's son, Robert Mennes, would state that Mennes had suffered a stroke and sustained partial paralysis on the left side of his body. As a result, his face was somewhat disfigured. Evidence was also presented that defendant was enrolled in a special education program for students with learning disabilities, and his IQ of 78 fell within the borderline range of intellectual potential. Defendant also suffered from a substance induced mood disorder with depressive and psychotic features, as well as a conduct disorder.

¶ 12 The jury found defendant guilty of first degree murder, home invasion, and residential burglary. On July 24, 2002, the trial court held a sentencing hearing. The State presented victim impact statements from Robert Mennes and the victim's daughter-in-law, Linda Conley. Defendant's presentence investigation report (PSI) indicated that he was arrested for a curfew violation when he was 14 years old, and he completed one year of probation.

¶ 13 Defense counsel presented evidence in mitigation. Dr. Albert Stipes, a forensic psychiatrist, testified that he interviewed defendant and reviewed the police and school reports in the case. He found that defendant was "in the borderline range of intellectual ability," which "is less than average but he is not mentally retarded." He also "found a mild thought disorder" associated with defendant's schizotypal personality type. It is a "life-long condition in which the person has odd or idiosyncratic speech and thought." Sometimes it is a "forerunner" to schizophrenia, but defendant did not have schizophrenia. Dr. Stipes also found evidence of "hallucinogen abuse" in that defendant had been "using LSD for two years and he used it every couple of months."

¶ 14 When asked what effect the mix of "youthful age, borderline intellectual functioning, and drug abuse" would have on defendant's thinking, Dr. Stipes stated that "it would certainly affect his judgment. His ability to make decisions would be poor. He might be impulsive. He might make

decisions without much information to go on, and he would misinterpret things that he would see or hear." Dr. Stipes further stated that "the drug abuse problem is a condition that can be rehabilitated certainly by confinement and by a drug treatment program. The personality disorder, if it does not develop into a more serious condition, can be treated with counselling." Also, "[a]ge takes care of itself. The older he gets hopefully the more he learns. *** For most of us age makes us less impulsive."

¶ 15    Mary Anna Paige, defendant's grandmother, testified that defendant lived with her for approximately 10 years prior to his arrest. Just a few years before he committed this offense, his stepfather was killed in a head-on collision. Until that time, defendant had been active in school and participated in sports.  He was close to his stepfather and he "just changed after that. He didn't want to really participate in team sports, he didn't talk very much to people."

¶ 16    Kimberly Paige also testified. She apologized to the Mennes family and stated that her family had also been torn apart. She had an on-and-off relationship with defendant's stepfather when he was alive, but they were not a broken family. She stated that she raised her family herself and worked 10-12 hour days. She saved money and bought her family a home. She did not believe defendant committed this offense.

¶ 17    In closing, the State acknowledged defendant's youth, but argued "the fact that he is so young and he commits this act only shows what it can lead to." Defendant did not have a substantial criminal history, but "he didn't start out with something piddley. He starts out with the murder of a 78-year-old man alone in his house where you would *** hope you would be safe." Defense counsel, however, argued that defendant was suffering from a combination "of his age and immaturity, his borderline intellectual functioning and his drug abuse, and this caused him to be impulsive, to misrepresent events and to make decisions hastily based on inadequate information."

Counsel asked the court "to consider [defendant's] youth, drug abuse, his intellectual deficiencies, the fact that he misperceived things *** because that was the condition that he was living under."

¶ 18 Defendant also spoke at the sentencing hearing. He apologized "for everything that has happened to the victim." Defendant stated that he is "a man of God. No longer a hoodlum," and that he will leave "[his] juvenile ways alone."

¶ 19 Before sentencing defendant, the trial court stated that "this has not been an easy case." The court reviewed its notes, the PSI report, victim impact statements, and the testimony by doctors regarding defendant's drug abuse, mental condition, and intellectual abilities. It noted that defendant was taking "alternative classes" and "doing well in some of them." Although defendant's mother did not have an easy life, his grandmother was a "strong woman" because she "took her daughter in, helped raise her daughter's children after she raised her son."

¶ 20 The court considered "[defendant's] age at the time of the offense and now," and accepted that "he has not had an easy life having been raised a lot with a single parent." However, defendant had a "strong male role model in his life" in his stepfather and "sort of a good family support system." The court noted defendant's substance abuse. The court "also considered the facts in the case," including the "fact that the defendant laid in waiting for [Mennes], hid, the brutality of the act, 18 stab wounds, while the victim was sitting defenseless in his chair." The court found there was "ample evidence of premeditation in this crime." It "took all these into consideration" and "weighed his rehabilitative potential as talked about here today versus the seriousness of this offense and the need to protect the public, especially the elderly public. That is a segment of our society in great need—in most need of protection." Defendant's "actions personified really the sum of all fears for homeowners. That is to die at the hands of a home invader."

¶ 21    The trial court sentenced defendant to 50 years' imprisonment for first degree murder, 25 years for home invasion to be served concurrently, and 15 years for residential burglary, to be served concurrently with the first degree murder sentence but consecutively to the home invasion sentence.

¶ 22    Defendant appealed, and this court affirmed his convictions for first degree murder and home invasion but vacated his conviction for residential burglary. See *People v. Paige*, No. 1-02-2768 (unpublished order under Supreme Court Rule 23).

¶ 23    On February 23, 2005, defendant filed a *pro se* post-conviction petition. The petition moved to the second stage where the trial court granted the State's motion to dismiss. This court granted appellate counsel's *Finley* motion and affirmed the dismissal. See *People v. Paige*, 2013 IL App (1st) 120538-U. Defendant did not file an appeal.

¶ 24    On June 28, 2016, defendant filed a *pro se* motion for leave to file a successive post-conviction petition. Therein, he alleged that he was 16 years old at the time of the offense and his sentence of 50 years' imprisonment was a *de facto* life sentence in violation of *Miller v. Alabama*, 132 S. Ct. 2455 (2012). Defendant requested a new sentencing hearing. Although the circuit court denied the motion, this court found that a new sentencing hearing was required to determine whether defendant's crime reflected "permanent incorrigibility" or the "unfortunate yet transient immaturity of youth." (Internal quotation marks omitted.) *People v. Paige*, 2020 IL App (1st) 161563, ¶ 40.

¶ 25    A new sentencing hearing was held before a different judge because the trial judge had retired. Prior to holding the hearing, the resentencing court issued a preliminary order. The court noted that in *People v. Buffer*, 2019 IL 122327, ¶¶ 40-42, our supreme court determined that a sentence of more than 40 years is a *de facto* life sentence for juvenile defendants. However,

discretionary life sentences are proper if the court had the opportunity to consider the defendant's youth and potential for rehabilitation, citing *People v. Jones*, 2021 IL 126432. The court also found that although the appellate court mandate required a finding of permanent incorrigibility, such a finding was not necessary under the recent United States Supreme Court case of *Jones v. Mississippi*, 141 S. Ct. 1307 (2021). The court would, however, abide by the appellate court mandate. Furthermore, defendant is now eligible for parole after serving 20 years. See 730 ILCS 5/5-4.5-115(b) (West 2020). The court determined that the applicable sentencing range for defendant was 20 to 60 years in prison. See 730 ILCS 5/5-4.5-20(a) (West 2020).

¶ 26    An updated PSI and mitigation report was filed prior to the hearing. The resentencing court also reviewed defendant's file at the Illinois Department of Corrections (IDOC) and exhibits relevant to defendant's conduct and rehabilitation.

¶ 27    At the resentencing hearing, the State presented the original victim impact statements and updated statements, along with defendant's disciplinary records at the IDOC. The State argued in aggravation that Mennes was 78 years old and physically handicapped from a stroke when he was killed. Defendant hid in Mennes' apartment before stabbing Mennes 18 times. He acted alone and his actions were premeditated. Regarding defendant's potential for rehabilitation, his IDOC records indicated that he had contraband violations, disobeyed orders, and was an enforcer for the Latin Kings gang. The State argued, however, that defendant was not permanently incorrigible and requested a sentence of 40 years' imprisonment.

¶ 28    The mitigation report detailed the lack of love and support during defendant's childhood. Defendant lost his stepfather, a positive role model, when he was 12 years old. Defendant's mother suffered from depression and alcohol abuse, and defendant moved to Palatine to live with his grandmother. He experienced "culture shock" and faced racial biases at school. He joined a gang

because it was the only place where he felt he belonged. On the day of Mennes' murder, defendant had an argument with a girl he was dating. She called him "worthless" and spat in his face. Afterwards, defendant found someone who bought alcohol for him and provided him with 30 to 40 strips of LSD. When defendant passed Mennes, he was in a highly intoxicated and paranoid state which caused him to subsequently stab Mennes. The report stated that defendant has a strong network of family and friends that would support him upon his release, including his mother, who has been sober for 10 years and has a stable job.

¶ 29    The defense argued in mitigation that defendant was 16 years old when he committed the offense, and he took drugs which impaired his thinking. Defense counsel discussed the factors set forth in *Miller*. Counsel argued that defendant's brain was still developing, which caused him to be immature and "impetuous." He was also raised by an alcoholic, emotionally distant and abusive mother, and he grieved the loss of his stepfather. Defendant had a learning disability and low IQ, but he also took advantage of opportunities to improve by earning his GED and other certificates. Although he had spent more than 22 years in maximum security prisons, defendant did not have a single violent incident. He was an enforcer for a gang in prison, but he enforced peace and did not resort to violence. The defense asked for a sentence of time served, or 22 years.

¶ 30    In allocution, defendant asked for forgiveness.

¶ 31    Before imposing defendant's sentence, the resentencing court stated that it "completely reviewed the record and read all the transcripts" of the trial proceedings. It also read the prior appellate court opinions. The court considered:

> "the evidence adduced at trial, the nature and circumstances of the offense, the defendant's history and character, the testimony presented today, the parties' arguments, the presentence investigation report, as originally prepared, the amended presentence

investigation report, the 16-page mitigation report *** , defendant's master file from the IDOC, the disciplinary records offered by the State, the certificates offered by the defense, the Court's exhibits and the defendant's allocution statement.

The Court also takes into account the victim impact statements from Robert Mennes and Linda Conley which were testified to in person this morning, as well as the ones read into the record this morning. The victim impact statements were quite poignant.

The Court considers and weighs the statutory factors in mitigation and aggravation with the exception of the harm caused by the offense since that is inherent in a first-degree murder conviction."

¶ 32 The court then addressed each of the statutory factors applicable to juvenile defendants set forth in section 5-4.5-105 of the Code. Relevant to this appeal, the court "accept[ed] the defendant had a difficult upbringing." It also noted that his mother and grandmother "have been loving and supportive of the defendant in the criminal justice process." It recognized the positive influence of defendant's stepfather, whose death "had a detrimental emotional impact on the defendant." Defendant's prior criminal history was also a mitigating factor where he "has not picked up any court cases since his conviction." The court further acknowledged the negative influence of gangs in defendant's life but noted that it did not cause him to commit the offense. Instead, defendant had stabbed Mennes "without the aid or suggestion of anyone else."

¶ 33 The resentencing court found the circumstances of the offense "extremely aggravating" where defendant, "without provocation, committed a completely senseless murder of a defenseless 78-year-old man relaxing in the sanctity of his home." Mennes had suffered a stroke and "was blind in one eye. He lived by himself and left his door open so paramedics could enter in the event of an emergency." The court also found that defendant's degree of participation in the offense was

"not mitigating" since he acted alone. "The offense was not an immediate impulsive reaction to a threat or any objective provocation by the victim." Instead, "[t]he offense involved forethought, premeditation, planning. This was not an impetuous offense." Defendant waited an hour after he perceived Mennes' facial expression to commit the murder. Regarding defendant's maturity, the court found that he was aware of the consequences of his actions. Although defendant had a learning disability, the court found him to be "intelligent" as he was able to draft a *pro se* successive postconviction petition.

¶ 34    The court next considered defendant's actual rehabilitation and potential for rehabilitation. It addressed Dr. Stipes' testimony at the original sentencing hearing and found no evidence of present substance abuse or mental health issues regarding defendant. During defendant's 22-year "stint" in prison, he acquired disciplinary adjudications for possessing a sewing needle and "nail clipper parts." He remained involved in gang-related activity and received disciplinary findings as a result. However, the court was "not ignorant of the role gangs and survival play in our penal institutions." It was "impressed by the lack of any disciplinary tickets for violence or fighting" and considered that to be mitigating evidence. Defendant also had expressed remorse at his original sentencing hearing and "has again apologized today."

¶ 35    The resentencing court stated:

> "This is a close issue. I personally believe [the trial judge]'s sentence was fair, but I took an oath to follow the law irrespective of my personal views. I came to court today with an open mind, and I did not make up my mind until after hearing today's presentations.
>
> Neither side is seeking a permanent incorrigibility finding. While the Court is not obligated to accept this, in this case it will.

In view of the totality of the circumstances and weighing all the statutory *Miller* factors, the Court finds that the defendant's crime unfortunately reflected the unfortunate yet transit [*sic*] immaturity of youth. The Court finds that the defendant is not a rare juvenile offender whose crime reflects irreparable corruption.

Based on the foregoing, and again considering all the evidence including permanent incorrigibility and the findings about the rehabilitation and the seriousness of the offense, and this is a very serious offense, I'll have to say, this is the most egregious offense I have ever heard on my time on the bench in eight years.

Based on all this, defendant Melvin Paige is hereby sentenced to 40 years in the Illinois Department of Corrections for first degree murder and 25 years for home invasion *** [which] shall run concurrently."

¶ 36 Defendant filed a motion to reconsider in which he argued that his sentence was excessive in light of the mitigation evidence presented at the hearing, and the court improperly considered as aggravation elements implicit in the offense. The court denied the motion, finding that defendant's allegations "are not supported by the record." The court noted that it had "expressly declined to consider *** harm caused by the offense because harm is inherent in the offense itself ***." Furthermore,

"The Court extensively weighed and considered each and every statutory *Miller* factor and all the mitigation presented by the Defense. The Court did not overlook or not consider mitigation in this case, and it was the mitigation that the Court considered that influenced the Court's decision to reduce this sentence by 10 years or 20 percent less than the original sentence.

"The Court will add that even if it is incorrect about the sentencing range in this case and the pre-*Dorsy* [*sic*] *** 20 to 40 sentencing year range applied, after balancing the appropriate aggravation and mitigation in this case, the Court still would have imposed a 40-year sentence on a first degree murder charge, which is not a *de facto* life sentence under any sentencing scheme."

¶ 37    Defendant filed this appeal.

¶ 38                                    II. ANALYSIS

¶ 39    Defendant contends that his sentence is excessive because the resentencing court, contrary to the explicit language of section 5-4.5-105(a), failed to consider in mitigation the circumstances of the offense and his degree of participation in the offense. The resolution of this issue requires us to interpret section 5-4.5-105(a) of the Code. Our primary objective in interpreting a statute is to ascertain and give effect to legislative intent. *People v. Rinehart*, 2012 IL 111719, ¶ 24. "[C]ourts should consider the statute in its entirety, keeping in mind the subject it addresses and the legislature's apparent objective in enacting it." *People v. Christopherson*, 231 Ill. 2d 449, 454 (2008). The language of the statute, given its plain and ordinary meaning, is the best indication of legislative intent, and we give effect to clear and unambiguous language without resorting to other tools of interpretation. *People v. Jones*, 223 Ill. 2d 569, 581 (2006). We review statutory interpretation matters *de novo*. *Rinehart*, 2012 IL 111719, ¶ 23.

¶ 40    Section 5-4.5-105(a) provides that "when a person commits an offense and the person is under 18 years of age at the time of the commission of the offense, the court, at the sentencing hearing conducted under Section 5-4-1, shall consider the following additional factors in mitigation in determining the appropriate sentence ***." 730 ILCS 5/5-4.5-105(a) (West 2020). The section lists nine factors, including "the circumstances of the offense" and "the person's

degree of participation and specific role in the offense, including the level of planning by the defendant before the offense." *Id.* 5-4.5-105(a)(5), (6).

¶ 41    Defendant argues that the resentencing court found these factors to be aggravating or "not mitigating," when it was required by the statute to consider them only "in mitigation." The court therefore misapplied these factors and its improper consideration resulted in an excessive sentence.

¶ 42    We disagree. Evidence presented "in mitigation" simply means that the evidence is being offered on behalf of defendant to reduce his sentence. See *People v. McNeal*, 175 Ill. 2d 335, 369 (1997). The State need not agree with defendant, and "may contest during the sentencing hearing the significance or weight of [his] evidence presented in mitigation and disagree with [his] assessment of the nature and character of it." *Id.* Furthermore, it is not "improper for a [sentencing court] to consider a defendant's evidence presented in mitigation as a factor in aggravation." *Id.* Nothing in section 5-4.5-105 prohibited the court from considering the circumstances of the offense, or defendant's degree of participation in the offense, as aggravating if the evidence supported that characterization. See *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 35.

¶ 43    The court below found the circumstances of the offense "extremely aggravating" where defendant, "without provocation, committed a completely senseless murder of a defenseless 78-year-old man relaxing in the sanctity of his home." It also found that defendant's degree of participation in the offense was "not mitigating" since he acted alone. In other words, defendant's degree of participation was 100%. "The offense was not an immediate impulsive reaction to a threat or any objective provocation by the victim." Instead, "[t]he offense involved forethought, premeditation, planning. This was not an impetuous offense." The court did not misapply these factors.

¶ 44   We recognize that *People v. Royer*, 2020 IL App (3d) 170794, a Third District case cited by defendant as support, held that the defendant's 60-year sentence violated the eighth amendment because "the sentencing court failed to consider the defendant's youth and its attendant characteristics as mitigation," and instead viewed the evidence as aggravation. *Id.* ¶¶ 29, 34. The appellate court in *Royer* found that "merely having evidence of the *Miller* factors before the [sentencing] court is not enough to show that the court considered it in mitigation" when the court "did not explicitly mention" the factors. *Id.* ¶¶ 29-30. The court found this concerning, particularly when the sentencing court stated that it considered one of the factors in aggravation. *Id.* ¶ 29.

¶ 45   We do not have the same concern in this case. Unlike *Royer*, the resentencing court below specifically addressed the evidence presented in mitigation for each statutory factor. Although the court found some of the evidence aggravating rather than mitigating, there is no question the court considered the factors set forth in section 5-4.5-105. *Royer* is distinguishable.

¶ 46   Defendant also argues that the resentencing court misconstrued the applicable sentencing range as 20 to 60 years, and that his 40-year sentence was the maximum he could have received because the court found he was not permanently incorrigible. The State responds that defendant forfeited review of this issue because he failed to raise it in his motion to reconsider. See *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) (to preserve a claim of sentencing error, defendant must make a contemporaneous objection and raise the issue in a post-sentencing motion). Defendant requests that we review the issue as plain error where the evidence was closely balanced, and the error was so egregious that he was denied a fair sentencing hearing. See *id*. at 545. Before we consider the issue as plain error, however, we must determine whether any error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 47    Defendant's contention is premised on *Buffer*'s rule that a *de facto* life sentence for a juvenile is more than 40 years, and on *People v. Holman*, 2017 IL 120655, which held that a juvenile offender may receive a life sentence only "if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46. Our supreme court, however, overruled *Holman* in *People v. Wilson*, 2023 IL 127666.

¶ 48    In *Wilson*, our supreme court acknowledged that *Holman* was no longer viable in light of *Jones v. Mississippi*, 141 S. Ct. 1307 (2021). In *Jones*, the United States Supreme Court held that under the eighth amendment, a juvenile may be sentenced to life in prison without parole so long as the sentence was imposed at the court's discretion. *Id.* at 1313. "[A] State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient," and a finding of permanent incorrigibility is not required. *Id.* Unless the court "expressly refuses as a matter of law to consider the defendant's youth *** , a discretionary sentencing scheme, in itself, satisfies *Miller*'s requirement that sentencing courts account for youth and its attendant circumstances." *Id.* at 1320. Our supreme court determined that the holding in *Holman* was "*directly* at odds with the holding in *Jones* ***." (Emphasis in the original.) *Wilson*, 2023 IL 127666, ¶ 42.

¶ 49    Defendant does not dispute that his sentence was discretionary, and the record shows that the court did not expressly refuse to consider his youth. Rather, after considering all of the factors in section 5-4.5-105, the court found that defendant's crime "reflected the unfortunate yet [transient] immaturity of youth" and sentenced him to 40 years in prison, which is not a *de facto* life sentence. Where defendant was sentenced under a scheme that gave the court discretion to consider his youth and potentially impose a less than a *de facto* life sentence, and the court did not

refuse as a matter of law to consider defendant's youth, he received the constitutional protections required under *Miller*. *Wilson*, 2023 IL 127666, ¶ 44.

¶ 50    Accordingly, the court could have imposed a *de facto* life sentence without parole even though it did not find defendant permanently incorrigible. See *id.* (noting that pursuant to *Jones*, "neither a finding of permanent incorrigibility nor an on-the-record sentencing explanation is constitutionally required before a juvenile may be sentenced to life without parole"). Thus, the maximum sentence defendant could have received was not 40 years, and the resentencing court did not misapprehend the applicable sentencing range.[2] Since no error occurred, there can be no plain error. *People v. Bannister*, 232 Ill. 2d 52, 71 (2008).

¶ 51    Defendant's final contention is that his sentence was excessive given the significant evidence in mitigation presented at the hearing. He argues that the resentencing court did not adequately consider his immaturity, dysfunctional family environment and upbringing, or his potential for rehabilitation. As a result, defendant requests that this court exercise its authority under Illinois Supreme Court Rule 615(b)(4) to reduce his sentence.

¶ 52    It is well-established that a sentencing court has "broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A reviewing court will not disturb that decision absent an abuse of discretion. *People v. Patterson*, 217 Ill. 2d 407, 448 (2005). In determining a sentence, the court considers and weighs all factors in mitigation and aggravation, as well as the nature and circumstances of the crime and defendant's participation in it. *People v. Quintana*, 332 Ill. App.

---

[2]Since we have determined that defendant's sentence complied with the constitutional requirements of *Miller*, we need not address his contention that the Illinois parole system does not provide juvenile offenders with a meaningful opportunity for release, rendering his sentence a violation of the eighth amendment and *Miller*.

3d 96, 109 (2002). A sentence within the statutory range will not be considered excessive unless it varies greatly with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Stacy*, 193 Ill. 2d 203, 210 (2000).

¶ 53    Defendant argues that although the resentencing court accepted his difficult childhood with an alcoholic and emotionally distant mother, the court "egregiously downplayed" that fact by finding that his mother and grandmother were supportive of him during the criminal justice process. Also, the court discounted defendant's youth when it found him to be "mature" because he was the "man of the house" and cared for his younger sister after his stepfather died. The court likewise downplayed his intellectual disabilities and disregarded the fact that his impulsive actions on the day of the offense resulted from his drug use and fight with his girlfriend.

¶ 54    The record indicates that the resentencing court explicitly considered these mitigating factors in light of all the evidence presented at the hearing. By arguing that the court "downplayed" or "discounted" these factors, defendant essentially is arguing that the court should have weighed the factors differently. A reviewing court will not find a sentence improper merely because it would have weighed the factors differently. *Stacy*, 193 Ill. 2d at 209. We find no reason to disturb the court's determination as to these factors.

¶ 55    Defendant also argues that his sentence was excessive because the resentencing court did not fully consider his potential for rehabilitation. He acknowledges that the court discussed his lack of disciplinary tickets for violence, his receipt of numerous certificates and his GED, and his attempts to "better himself," but argues that the court "failed to fully assess" his rehabilitative potential. As support, defendant cites *People v. McKinley*, 2020 IL App (1st) 191907, ¶¶ 73-75.

¶ 56    In *McKinley*, the defendant presented significantly more evidence of his rehabilitation, including 10 education certificates, his participation in numerous programs associated with

universities, his admittance into Northwestern University's prestigious Prison Education Program, a number of highly complimentary letters from professors, and evidence that he was a model inmate during his 17 years in prison with no disciplinary tickets. *Id.* Despite this overwhelming evidence, the trial judge superficially acknowledged that the defendant "does have rehabilitative potential. There is no question about it." *Id.* ¶ 78. This court therefore found that the "trial judge's brief, general references to defendant's rehabilitation indicate that the trial judge disregarded the extent of defendant's rehabilitation and did not afford it adequate weight." *Id.*

¶ 57    In contrast to *McKinley*, the resentencing court in the case at bar considered and specifically addressed all of the mitigating evidence presented. The mere existence of mitigating evidence did not obligate the court to impose the minimum sentence. *People v. Sims*, 403 Ill. App. 3d 9, 24 (2010). Although the court did not impose the minimum, it significantly reduced defendant's sentence from 50 to 40 years in light of the mitigation evidence. Moreover, while the court commended defendant's efforts at rehabilitation, it also determined that he "carried out a forceful, violent murderous reaction to a misperceived facial expression caused by Mr. Mennes' stroke," and the offense "involved forethought, premeditation, [and] planning." It noted that defendant "clandestinely invade[d] Mr. Mennes' home before attacking him and stabbing him multiple times without any provocation whatsoever." The court found the murder of Mennes to be a "very serious offense ***, the most egregious offense I have ever heard on my time on the bench in eight years." The resentencing court was not required to give greater weight to mitigating factors than to the severity of the offense. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 55. We find that the court did not abuse its discretion in sentencing defendant to 40 years in prison.

¶ 58                                    III. CONCLUSION

¶ 59    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 60    Affirmed.